Wilhelm **LORENZ,** Bruce Schmalz and Tom Tyslan, Plaintiffs–Appellants,

v.

**STATE of Colorado, Defendant–Appellee.**

No. 96SA8.

Supreme Court of Colorado,
En Banc.

Dec. 3, 1996.

---

Isaacson, Rosenbaum, Woods & Levy, P.C. Edward T. Ramey, Theresa L. Corrada, Denver, for Plaintiffs–Appellants.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor Gener-

al, Paul Farley, Deputy Attorney General, Larry A. Williams, First Assistant Attorney General, Thomas D. Fears, Assistant Attorney General, Denver, for Defendant–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

The issue in this case is whether section 12–47.1–804(1), 5B C.R.S. (1996 Supp.),[1] of the Limited Gaming Act of 1991 (the Act), which prohibits certain elected and appointed officials from holding an interest in a gaming license, violates the Constitutions of the United States and the State of Colorado (State). The case is before us on certification from the court of appeals. We conclude that the section does not impermissibly burden candidates' or voters' rights and thus, we affirm the trial court's order granting the State's motion to dismiss.

## I.

Plaintiff Wilhelm Lorenz was elected mayor of Black Hawk in 1986 and reelected in 1990 for a second term. During his second term, Lorenz applied for a key employee license.[2] Because of the impact of section 12–47.1–804(1), Lorenz resigned as mayor in order to be granted the license. In the summer of 1993, Lorenz contacted the Black Hawk City Clerk in order to become a candidate for the Black Hawk City Council. The clerk allegedly denied Lorenz's request to have his name placed on the ballot because

he had an interest in a casino which was licensed as a retailer under the Act.

Plaintiff Bruce Schmalz was elected mayor of Central City in 1986 and reelected in 1990 to a second term. Schmalz was also a member of the Central City Planning Commission. In 1991, members of Schmalz's family formed Dostal Alley, Inc., a Colorado corporation. Schmalz and his family then submitted applications for gaming licenses for themselves and the corporation to the Colorado Limited Gaming Control Commission (the Commission). In a letter dated September 6, 1991, Schmalz informed the Commission that he was not involved in the corporation, but that he owned the building which housed the corporation and leased a portion of the building to the corporation for a flat fee. Schmalz claims that he was informed by an inspector for the Commission that he had to resign as mayor in order for Dostal Alley, Inc., to receive its licenses. Schmalz resigned as mayor of Central City and as a member of the Central City Planning Commission on September 19, 1991.

Plaintiff Tom Tyslan is a resident of the City of Black Hawk. Tyslan claims that he is interested in seeking public office someday. Tyslan also claims that in the 1994 spring election he was unable to vote for the candidates of his choice because those candidates held gaming licenses and were thus not eligible to run for office.

On June 10, 1994, Lorenz, Schmalz, and Tyslan (the Plaintiffs) filed a complaint against the State in Denver District Court seeking declaratory relief.[3] At the time the

---

**1.** Section 12–47.1–804(1) provides:

None of the following persons shall have any interest, direct or indirect, in any license involved in or with limited gaming:

(a) Officers, reserve police officers, agents, or employees of any law enforcement agency of the state of Colorado with the authority to investigate or prosecute crime in Teller or Gilpin counties or of any local law enforcement agency or detention or correctional facility within Teller or Gilpin counties;

(b) District, county, or municipal court judges whose jurisdiction includes all or any portion of Teller or Gilpin counties;

(c) Elected municipal officials or county commissioners of the counties of Teller and Gilpin and of the cities of Central, Black Hawk, and Cripple Creek;

(d) Central, Black Hawk, or Cripple Creek city manager or planning commission member.

**2.** The Act provides for five types of gaming licenses: slot machine manufacturer or distributor; operator license; retail gaming license; support license; and key employee license. § 12–47.1–501, 5B C.R.S. (1991 & 1996 Supp.).

**3.** The Plaintiffs filed a Second Amended Complaint on December 30, 1994. The Second Amended Complaint added a new claim seeking to enjoin several named city and county clerks from enforcing § 12–47.1–804(1), but was otherwise identical to the original complaint. The city and county clerks were subsequently dismissed by voluntary agreement of the parties. Therefore, this opinion does not address the Plaintiffs' claim for injunctive relief.

complaint was filed, Lorenz and Schmalz held key employee licenses and Tyslan held a support license. Lorenz was also an officer, director, and part owner of Black Forest Inn, Inc. Black Forest Inn, Inc., held an operator license and owned two casinos, both licensed as retailers under the Act. Schmalz was a director, officer, and shareholder of Dostal Alley, Inc., which was also licensed as an operator and a retailer.

In their complaint, the Plaintiffs charged that section 12–47.1–804(1) violated the following federal and state constitutional rights: (1) the rights of free expression, association, and political participation under the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution; (2) the right to run for public office, the right to hold public office, and the fundamental right to vote under the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution and article II, section 25 of the Colorado Constitution; and (3) the due process right to be free from impermissibly vague prohibitions under the First and Fourteenth Amendments to the United States Constitution and article II, sections 10 and 25, of the Colorado Constitution.

The State filed a motion to dismiss on August 18, 1994, and the Plaintiffs filed a motion for summary judgment on September 13, 1994. On October 24, 1995, after considering both motions, the trial court granted the State's motion. The trial court held that section 12–47.1–804(1) was a condition to licensure and did not bar the Plaintiffs from holding public office.

The Plaintiffs appealed the trial court's decision to the court of appeals. On joint motion of the parties, the court of appeals filed a request in this court for determination of jurisdiction, and we accepted the case pursuant to section 13–4–109(2), 6A C.R.S. (1987).[4]

## II.

▪ The threshold question in this case is whether section 12–47.1–804(1) impermissibly impacts the exercise of any constitutional right. Generally, constitutional review of equal protection and substantive due process claims involves a determination of whether the right being abridged is fundamental or not: if it is, then the courts are called upon to strictly scrutinize the offending restriction. *People v. Young,* 859 P.2d 814, 818 (Colo. 1993) (substantive due process analysis); *Dove v. Delgado,* 808 P.2d 1270, 1274 (Colo. 1991) (equal protection analysis). If it is not, then the restriction must only bear a rational relationship to a legitimate state objective in order to survive constitutional muster. *Young,* 859 P.2d at 818; *Dove,* 808 P.2d at 1274.

▪ That inquiry is conclusory and of limited utility in the context of ballot access cases. As we noted in *Colorado Libertarian Party v. Secretary of State,* 817 P.2d 998, 1001 (Colo.1991), *cert. denied, Colorado Libertarian Party v. Meyer,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992), in assessing the constitutionality of ballot access restrictions, sometimes the courts apply strict

**4.** The Plaintiffs framed the following issues for review:

1. Whether the district court erred in holding that § 12–47.1–804(1), C.R.S. (the "Statute") prohibiting persons who hold certain local political offices from holding a direct or indirect interest in a gaming license does not violate the First and Fourteenth Amendments to the United States Constitution and Article II, §§ 10 and 25 of the Colorado Constitution.

2. Whether the district court erred in holding that the Statute does not unconstitutionally restrict candidates' and voters' rights to electoral participation under the First and Fourteenth Amendments to the United States Constitution and Article II, § 10 of the Colorado Constitution.

3. Whether the district court erred in holding that the Statute is necessary to advance a state interest of compelling importance.

4. Whether the district court erred in failing to consider whether the Statute is narrowly drawn.

5. Whether the district court erred in failing to consider whether the Statute is irrationally and arbitrarily discriminatory in violation of the Fourteenth Amendment to the United States Constitution and Article II, § 25 of the Colorado Constitution.

6. Whether the district court erred in failing to consider whether the Statute is unconstitutionally vague in violation of the First and Fourteenth Amendment to the United States Constitution and Article II, §§ 10 and 25 of the Colorado Constitution.

scrutiny and sometimes a more flexible standard. Regardless of which standard they apply, what the courts consistently analyze is the severity and character of the alleged injury. If the magnitude of the impact is severe, or if the restriction operates to exclude candidates on the basis of wealth or political affiliation, then considerably more exacting scrutiny is brought to bear. *Clements v. Fashing,* 457 U.S. 957, 964–66, 102 S.Ct. 2836, 2844–45, 73 L.Ed.2d 508 (1982) (plurality opinion). In short, we must apply a balancing test which weighs the restriction against the state interest. If the restriction is severe in impact or in character, then the state must put forth counterbalancing interests of greater weight in order to sustain the restriction. *See Anderson v. Celebrezze,* 460 U.S. 780, 788–89, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983). If the restriction is not severe in impact or character, then the state's interests may be of lesser weight or probity. *See Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992).

Plaintiffs here assert that section 12–47.1–804(1) impermissibly abridges a candidate's right of access to the ballot and to hold office, and a voter's right of political association,

political expression, and choice of candidates.[5] They argue that the statute deters candidacy because many potential candidates cannot afford to surrender an interest in a gaming license, and thus do not run for office.[6] Similarly, they argue that the voters are severely impacted because they are denied the right to vote for a significant number of potential candidates.

The State argues that section 12–47.1–804(1) does not actually hinder access to the ballot, nor does it restrict the right to cast a vote, but rather only restricts an elected official's conduct.

## A.

Typical ballot access cases involve governmental action that directly restricts a candidate's ability to obtain a place on the ballot.[7] Here, the only burden arguably imposed is the indirect risk of losing an interest in a gaming license. Although those potential candidates who are unwilling to risk losing an interest in gaming licenses may decide not to run, requiring candidates to make this decision impacts them indirectly only.[8]

---

**5.** The rights of freedom of association, freedom of expression, and the right to vote are closely intertwined. In a case analyzing ballot access restrictions, the Supreme Court stated:

> In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.

*Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968).

Freedom of expression is implicated because "an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569. Thus, the Plaintiffs' claims that § 12–47.1–804(1) violates their rights of freedom of association, freedom of expression, and the right to vote for the candidate of one's choice are all related. For this reason we will refer to the voters' rights at issue in this case collectively as the right to vote.

**6.** The Plaintiffs' argument that § 12–47.1–804(1) burdens the right to hold office is based upon the allegation that public officials who hold interests

in gaming licenses choose to resign rather than surrender these interests.

**7.** *See Anderson,* 460 U.S. at 782, 103 S.Ct. at 1566–67 (state refused to allow candidate place on ballot because his statement of candidacy was submitted after filing deadline); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 177–78, 99 S.Ct. 983, 986–87, 59 L.Ed.2d 230 (1979) (state denied candidates place on ballot because candidates failed to meet signature requirement); *Lubin v. Panish,* 415 U.S. 709, 710, 94 S.Ct. 1315, 1317, 39 L.Ed.2d 702 (1973) (required filing fee denied indigent candidate access to the ballot); *Cowan v. Aspen,* 181 Colo. 343, 346, 509 P.2d 1269, 1271 (1973) (three-year durational residency requirement prevented candidates from having names placed on ballot).

**8.** We are wary of the implications associated with treating a statute which requires candidates to forego business interests in exchange for public office as an impermissible restriction on ballot access. Conflict of interest laws often require that public officials sacrifice personal gain in order to assure impartiality and the appearance of impartiality in the performance of job-related duties.

Nonetheless, we recognize that the restriction may create a very real, if indirect, impact on some potential candidates and therefore analyze it as if it were a direct restriction on access to the ballot. *See NAACP v. Alabama*, 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958).

We begin our analysis by noting that access to the ballot for a prospective candidate is frequently statutorily or constitutionally burdened by conditions such as residency, age, filing fees, filing deadlines, and signature requirements.[9] Clearly then, a law that imposes a burden on access to the ballot for a prospective candidate is not automatically invalid. *See Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063. We determine the validity of a challenged restriction by measuring the impact and balancing it against the State's interest as instructed in *Anderson* and *Clements*. *See also Burdick*, 504 U.S. at 438, 112 S.Ct. at 2065–66 (applying the *Anderson* standard to state law prohibiting write-in voting); *Colorado Libertarian Party*, 817 P.2d at 1002; *National Prohibition Party v. State*, 752 P.2d 80, 83 n. 4 (Colo.1988).

■ The *Anderson* standard requires that we "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. We must then determine the legitimacy and strength of each of the interests relied upon by the State to justify the restriction and also consider the extent to which those interests make it necessary to burden the Plaintiffs' rights. *Id.*

In this case, we do not find the nature of the injury to a potential candidate to be severe. Section 12–47.1–804(1) does not force candidates to give up any business interests in order to run for office; nor does it require that elected officials resign if they have an interest in a gaming license.[10] If an elected official were to apply for a gaming license, the Commission would be entitled to deny the application outright. *See* § 12–47.1–510(1), 5B C.R.S. (1991). If a candidate who already holds a direct or indirect interest in a gaming license is elected, the Commission would be entitled to revoke the license pursuant to section 12–47.1–525, 5B C.R.S. (1991). Thus, the Commission is limited to denying or revoking a public official's interest in a license and the Commission does not have any authority to cause a public official to resign or to prevent a candidate from running.

Although section 12–47.1–804(1) may require that a public official forego a lucrative business opportunity, this requirement does not create a substantial impediment to the right to run for office or the right to hold office.

■ The Plaintiffs also argue that section 12–47.1–804(1) impermissibly "fences out" an independently identifiable class consisting of those who hold interests in gaming licenses. In *Evans v. Romer*, 854 P.2d 1270, 1282 (Colo.1993) (*Evans I*), we held:

[T]he Equal Protection Clause of the United States Constitution protects the fundamental right to participate equally in the political process, and that any legislation ... which infringes on this right by "fenc-

---

9. For example, § 31–4–102(1), 12B C.R.S. (1986), provides that the mayor "shall be a registered elector who has resided within the limits of the city for a period of at least twelve consecutive months immediately preceding the date of the election...." Candidates for mayor of a city must also be nominated by at least twenty-five registered electors residing within the city. § 31–10–302, 12B C.R.S. (1986).

10. Lorenz contends that the manner in which § 12–47.1–804(1) is applied and enforced requires candidates to relinquish their interests in gaming licenses before they can be placed on the ballot. This contention is based upon his allegation that the city clerk refused to place his name on the ballot as a candidate for city council because he held an interest in a gaming license. Although the city clerk was at one time a party to the action, she was subsequently dismissed by voluntary agreement of the parties. Hence, although in reviewing the motion to dismiss we are required to view the facts in the light most favorable to the Plaintiffs, issues concerning alleged inappropriate enforcement techniques are not before the court.

ing out" an independently identifiable class of persons must be subject to strict judicial scrutiny.

We disagree that *Evans I* offers support to the Plaintiffs' position. Those candidates who hold an interest in a gaming license and refuse to run are not part of an independently identifiable class. In *Evans I,* we were concerned about a voter initiated amendment to our constitution (Amendment 2) infringing upon the ability of an identifiable group of voters to participate equally in the political process. We did not hold, and we do not now hold, that a group of persons with the same occupation or business interest constitutes an independently identifiable class.

In *Evans v. Romer,* 882 P.2d 1335, 1349 (Colo.1994) (*Evans II* ), aff'd, *Romer v. Evans,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), we noted that Amendment 2 targeted a class of persons based on four characteristics: sexual orientation, conduct, practices, and relationships. *Evans II,* 882 P.2d at 1349. None of those identifying characteristics is present in this case and the Plaintiffs fail to provide characteristics other than occupation or business interest to identify this purported class.

Section 12–47.1–804(1) does not operate to deny candidates an interest in a license, does not require public officials to resign, and does not fence out an independently identifiable class of candidates. Therefore, we believe section 12–47.1–804(1) imposes only a limited burden on the right to run for and hold public office.

■ We now focus our attention on the severity of the impact on voters who are unable to select the candidates of their choice. In assessing the impact of legislation which may limit the field of candidates from which voters might choose, "[t]he interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance." *Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).

The Plaintiffs argue that section 12–47.1–804(1) has a significant impact on the rights of voters in the towns and counties where it applies because most of the commercial activity in those areas has some connection to gaming. As a result, a sizable segment of the population in those areas is barred from running for local office because of direct interests in gaming licenses. In addition, an unknown number of candidates may also be deemed to have indirect interests in licenses. The Plaintiffs conclude that the net effect is to deprive voters of a reasonable choice of candidates who are best qualified for political office.

At the outset, we do not agree with the assumption that those persons with an interest in a gaming license are necessarily the best qualified for office. Nor are the Plaintiffs correct in suggesting that voters are deprived of the opportunity to choose any candidate who holds an interest in a license. Only those persons who are unwilling to surrender their interests in gaming licenses if elected will refuse to run.

Whether the burden on voters' rights is severe does not turn on the number of candidates who may potentially decline to run. The problem with such a rule is apparent in this case. If the determination as to the severity of the burden in this case were tied to the percentage of license holders in the community, we would be required to reevaluate the extent of the burden with every change in population. Severity is not a measurement that weighs numbers; it is a measurement that weighs wrongful impact.

In calculating the relevant measurement, we are guided by the Supreme Court's holding in *Clements.* In *Clements,* a plurality of the Supreme Court identified a two prong test to be used in evaluating the nature of the impact a ballot access restriction may have on voters. *Clements,* 457 U.S. at 964–66, 102 S.Ct. at 2844–45. The test looks to: (1) whether the restriction involves classifications based on wealth, *see, e.g., Lubin,* 415 U.S. at 718, 94 S.Ct. at 1320–21 (mandatory filing fees operated to exclude indigent candi-

dates from ballot); *Bullock v. Carter*, 405 U.S. 134, 144, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) (filing fee system fell with unequal weight on candidates according to their economic status); or (2) whether it imposes burdens on new or small political parties or independent candidates, *see, e.g., Illinois State Bd. of Elections*, 440 U.S. at 187, 99 S.Ct. at 991–92 (state election law imposed unconstitutional signature requirements on independent candidates and new political parties); *Williams*, 393 U.S. at 25, 89 S.Ct. at 7 (state election laws made it virtually impossible for any party other than the two major parties to qualify candidates for the ballot). *Clements*, 457 U.S. at 964, 102 S.Ct. at 2843–44.

In subjecting section 12–47.1–804(1) to that test, we find that it is of limited impact and that it creates neither financial nor political affiliation classifications.

Section 12–47.1–804(1) does not involve filing fees or restrictions that invidiously burden the indigent; potentially quite the contrary. In this case, the candidates are not faced with a mandatory fee that they may not have the funds to pay. The Plaintiffs' assertion that most license holders cannot afford to surrender their interests in gaming licenses belies common expectations. Almost every public position involves some monetary sacrifice. As a society, we embrace the concept that public service should not yield private gain.

Neither does section 12–47.1–804(1) contain any classification that imposes special burdens on minority political parties or independent candidates in violation of the second prong of the *Clements* test. The concern with such burdens is that voters with political views outside those of the established political parties will not have an opportunity to express those views. In this case, there is no suggestion that section 12–47.1–804(1) preempts candidates who support the gaming industry or any other viewpoint. Those voters who support the gaming industry are still able to vote for candidates who represent this interest. Thus, section 12–47.1–804(1) does not "fence out" an independently identifiable class of voters.[11] In fact, the Plaintiffs have asserted that they do not have an opportunity to vote for the individuals of their choice, but they have not argued that the fact that some individuals with an interest in a gaming license refuse to run precludes the plaintiffs from choosing a candidate who adequately represents their views.[12]

We are satisfied that section 12–47.1–804(1) does not severely burden a candidate's access to the ballot or a voter's ability to exercise preferences.

## B.

We must nonetheless weigh the burden that is imposed against the proffered governmental objective. The State asserts that it has an interest in preventing corruption and the appearance of corruption among its elected officials. In particular, the State argues that section 12–47.1–804(1) removes the possibility of wrongdoing or the possibility of acts motivated by self-interested public servants.

**11.** The only group that may be considered to be "fenced out" is that group of voters who desire to vote for candidates who hold an interest in a gaming license and refuse to run. However, such voters do not constitute an independently identifiable group. *See Gordon v. Lance*, 403 U.S. 1, 5, 91 S.Ct. 1889, 1892, 29 L.Ed.2d 273 (1971) (no independently identifiable group or category that favors bonded indebtedness over other forms of financing and thus state laws did not fence out any sector of the population because of the way they would vote).

**12.** The distinction between the right to vote for a particular individual and the right to vote for a candidate who most nearly represents one's views is significant. The First Amendment guarantees the right to associate with others in support of certain political views and the ability to vote for a candidate professing those views; it does not guarantee the right to vote for a specific individual. For this reason, the Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." *Burdick*, 504 U.S. at 438, 112 S.Ct. at 2066. Thus, the fact that § 12–47.1–804(1) may deny some voters the right to vote for the individual of their choice does not imply that the burden it imposes is severe.

The State undoubtedly has a substantial and legitimate interest in preventing corruption among public officials. The Plaintiffs recognize the existence of this interest, but argue that, although limited stakes gaming has been in effect for nearly five years, the State has not presented any evidence demonstrating that corruption and improper influence by gaming interests on public officials is a real danger. They maintain that "[t]o prevent citizens from voting for the most qualified and experienced candidates ... based on speculative and unfounded fear that their choices may some day prove to be imprudent is highly paternalistic." Brief for Plaintiffs at 21.

We do not agree that the State's fear concerning the association of corruption with gambling is speculative and unfounded. The fact that the State is unable to produce evidence of corruption associated with the gaming industry may speak more to the effectiveness of the State's restrictions than to the reality of the potential for corruption. Indeed, numerous courts [13] and state legislatures, including our own,[14] have acknowl-

edged the potential for corruption associated with gambling.

Further, the Supreme Court has recognized that the government's "substantial" interest in the health, safety, and welfare of its citizens may justify the regulation of gambling. *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328, 341, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1985). We recognize the criminal influence often associated with gambling and the detrimental effect gambling may have on society. Limited gaming is legal in Colorado; however, it is still suspect in our society. We agree that gambling has a potentially corruptive effect on government and that the State therefore has a substantial interest in regulating the relationship between local politics and the gaming industry. We also believe that the State has a substantial interest in avoiding the appearance of corruption. *See Greenberg v. Kimmelman*, 99 N.J. 552, 494 A.2d 294, 299 (1985) ("We are concerned not only with impropriety, but also with its appearance, which is always more subtle than impropriety itself.").[15]

**13.** Courts in jurisdictions that allow gambling have recognized that gambling, although a legal profession, "does not carry with it the rights and entitlements inherent in useful trades and occupations." *State v. Rosenthal*, 93 Nev. 36, 559 P.2d 830, 835 (1977), *appeal dismissed, Rosenthal v. Nevada*, 434 U.S. 803, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977). *See also Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir.1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977); *Knight v. Margate*, 86 N.J. 374, 431 A.2d 833, 842 (1981).

**14.** During the course of the hearings on House Bill 91–1316, the legislature specifically identified two areas in which holding an interest in a gaming license could lead to corruption. Representative Kopel stated:

The [Act] gives the Gaming Commission the authority to issue the licenses. But that [Act] also gives the elected officials in those municipalities the authority to pass on the facades that are going to be placed upon the buildings where the gaming is going to go on.

Even if the Gaming Commission approves a license, if the [city council] ... refuses to issue an approval of a facade on the front of the building, no gaming can occur at that particular facility.

As a result, you have two kinds of licenses involved here. You have the gaming license,

and we've made ... sure ... that the Gaming Commission will not have any involvement, because they have to issue a license. The local officials have to issue a license, also.

....

And for that reason, because they do have the authority to stall a competitor, chill a competitor's right to have his license, by turning down his facade, this means they are in the same position as the members of the Gaming Commission are.

House Debate on H.B. 91–1316, 58th Gen. Assembly, 1st Sess., Apr. 11, 1991. The second expressed concern was that public officials with the responsibility of directing law enforcement officers might be reluctant to order officers to enforce gaming laws. *See id.* (statement of Rep. Foster).

**15.** In *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637–38, 46 L.Ed.2d 659 (1976), the Supreme Court discussed, in the context of large financial contributions, the detrimental effect the appearance of corruption may have on government. Our legislature also values the appearance of propriety as an important goal. Specifically, § 12–47.1–102(1)(a), 5B C.R.S. (1991), provides: "The success of limited gaming is dependent upon public confidence and trust that licensed limited gaming is conducted honestly and competitively; that the rights of the creditors of

Section 12–47.1–804(1) seeks to address the government's concerns about corruption and the appearance of corruption by eliminating potential conflicts of interest among those public officials given the responsibility of enforcing gaming regulations and setting policy impacting the gaming industry. The State is concerned that if these office holders retain interests in gaming licenses, their decisions impacting the gaming industry may in fact be based upon, or may appear to be based upon self interest rather than sound public policy. Gambling is an industry that is highly susceptible to the influence of organized crime. It is also an industry that relies heavily upon public confidence. Because of these special considerations, the legislature may legitimately preclude certain public office holders from retaining or acquiring an interest in a gaming license. The nexus between the license and the office is clear and supportable.

We conclude that the State's substantial interest in avoiding corruption and the appearance of corruption in both the gaming industry and local government in Cripple Creek, Central City, and Black Hawk, outweighs the limited burden section 12–47.1–804(1) places on ballot access, the right to hold public office, or on a voter's rights.[16]

## III.

The Plaintiffs also argue that, according to the doctrine of "unconstitutional conditions," the State may not require the surrender of a constitutional right in exchange for the grant of a discretionary benefit. The Plaintiffs allege that section 12–47.1–804(1) violates this doctrine because it offers the benefit of a gaming license on the condition that the applicant give up the right to hold public office.

The fact that a license may be conditioned on the surrender of a right does not necessarily make the condition "unconstitu-

tional." "[W]hether a condition is unconstitutional depends on whether government may properly demand sacrifice of the alleged right in the particular context." Laurence H. Tribe, *American Constitutional Law* § 11–5 (2d ed. 1988). In other words, the doctrine of "unconstitutional conditions" requires that in order to condition the grant of a discretionary benefit on the release of a constitutional right, the government must have an interest which outweighs the particular right at issue. *See Board of County Comm'rs, Wabaunsee County, Kansas v. Umbehr,* —— U.S. ——, ——, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (1996) (government may not terminate contract with independent contractor because contractor engaged in protected speech unless legitimate countervailing government interests are sufficiently strong); *Dolan v. City of Tigard,* 512 U.S. 374, ———— ————, 114 S.Ct. 2309, 2317–21, 129 L.Ed.2d 304 (1994) (government must have constitutionally sufficient reason to condition grant of building permit on landowner's willingness to give up Fifth Amendment right to receive just compensation when property is taken for a public use); *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980) ("[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency."); *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2686, 49 L.Ed.2d 547 (1976) (termination of public employees for sole reason that they were not affiliated with particular political party restrains First Amendment rights and government must show vitally important interest to justify such action) (plurality opinion); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) (government cannot condition grant of unemployment compensation upon willingness to abandon religious beliefs without compelling interest); *Speiser v. Randall,* 357 U.S. 513, 529, 78 S.Ct. 1332, 1344, 2 L.Ed.2d

licensees are protected; and that gaming is free from criminal and corruptive elements...."

16. Necessarily then, § 12–47.1–804(1) does not create an arbitrary or irrational classification in violation of the equal protection clause.

1460 (1958) (striking down state law requiring loyalty oaths for tax exemption because state failed to show compelling interest).

Thus, section 12–47.1–804(1) only imposes an "unconstitutional condition" if the Plaintiffs' constitutional right to hold public office outweighs the State's interest in avoiding corruption and the appearance of corruption. In section II, *supra*, we concluded exactly the opposite. For this reason, withholding an interest in a gaming license from a public official does not constitute an "unconstitutional condition."

## IV.

■ Finally, the Plaintiffs assert that sec-. tion 12–47.1–804(1) is unconstitutionally vague in violation of the First and Fourteenth Amendments to the United States Constitution and article II, sections 10 and 25 of the Colorado Constitution. Although section 12–47.1–804(1) prohibits public officials from holding a direct or indirect interest in a gaming license, it does not define the terms "indirect" or "interest." The Plaintiffs argue that in the absence of definitions for these terms, section 12–47.1–804(1) fails to give fair warning as to the type of relationship with gaming that is forbidden and leads to ·arbitrary and capricious enforcement.

The trial court did not consider the Plaintiffs' vagueness claim because at the time they filed the complaint, all of the Plaintiffs held direct interests "in limited gaming establishments." *Lorenz v. State*, No. 94 CV 2921 (Denver Dist. Ct. Oct. 24, 1995) (order granting motion to dismiss).

The Supreme Court has held that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). We adopted this rule in *Mr. Lucky's v. Dolan*, 197 Colo. 195, 199, 591 P.2d 1021, 1024 (1979) ("where a party should reasonably know that

its conduct comes within the language of the proscription, it cannot challenge the language of that proscription as unconstitutionally vague").

The rationale for this limitation is twofold. First, the limitation "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960). Second, it "assures the court that the issues before it will be concrete and sharply presented." *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984). *See also City of Lakewood v. Colfax Unlimited Ass'n*, 634 P.2d 52, 60 (Colo.1981) ("the imprecision of a vague law as to a third party's right 'has little relevance ... where [a litigant's] conduct falls squarely within the "hard core" of the statute's proscriptions....'") (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973)). Although an exception to this basic rule of standing applies in First Amendment cases, to take advantage of the exception, a litigant "must demonstrate that the statute in question is vague either in all possible applications or at least as applied to the litigant's conduct, and not simply as applied to some others." Laurence H. Tribe, *American Constitutional Law* § 12–32 (2d ed. 1988). *See Parker*, 417 U.S. at 753–58, 94 S.Ct. at 2560–63; *City of Lakewood*, 634 P.2d at 59–60.

■ Thus, even in First Amendment cases, we have generally "refused to relax traditional rules of standing in the context of a vagueness challenge absent an allegation that the statute is vague in all of its applications, since the doctrine is geared more to the protection of defendants from standardless or discriminatory enforcement than to the protection of hypothetical third parties." [17] *City of Englewood v. Hammes*, 671

---

**17.** We have held that Colo. Const. art. II, § 10 provides broader protection for freedom of speech than does the First Amendment. *People*

*v. Seven Thirty–Five East Colfax, Inc.*, 697 P.2d 348, 356 (Colo.1985). Despite this distinction, we apply the same rules of standing to vagueness

P.2d 947, 951 (Colo.1983). A statute is vague in all of its applications if it does not provide any "ascertainable standard for inclusion or exclusion." *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).

The Plaintiffs do not allege that section 12–47.1–804(1) is vague in all of its applications, nor do we believe that such a claim is tenable. Section 12–47.1–804(1) does provide at least some ascertainable standards for inclusion. For example, there is no doubt that a financial interest in a business owning a gaming license is an indirect interest within the meaning of the statute. Such being the case, the Plaintiffs will only have standing to challenge section 12–47.1–804(1) on vagueness grounds if it is vague as applied to them. The Plaintiffs cannot satisfy this requirement because their personal ownership of gaming licenses constitutes a direct interest and clearly falls within the "hard core" of section 12–47.1–804(1)'s proscriptions. In addition to these direct interests, at the time the complaint was filed, both Lorenz and Schmalz clearly held indirect interests within the meaning of the statute as a result of their ownership of corporations which held gaming licenses.[18]

The reason for the relaxed rules of standing in First Amendment cases is that:

[W]hen there is danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

*Secretary of State of Md.*, 467 U.S. at 956–57, 104 S.Ct. at 2847 (quoting *Broadrick*, 413 U.S. at 612, 93 S.Ct. at 2916). In the case of section 12–47.1–804(1), the danger of chilling free speech is minimal. Even if individuals who are unwilling to surrender interests in gaming licenses do not run for office, they may still freely express their political views. License holders are free to contribute to political campaigns, campaign on behalf of political candidates, and hold political offices other than those specified in section 12–47.1–804(1) without being required to surrender an interest in a gaming license. In addition, there is no allegation that those candidates who are willing to run do not adequately represent the views of those who decline to run, or that section 12–47.1–804(1) limits debate on issues of public concern. In light of the fact that section 12–47.1–804(1) does not have a chilling effect on speech, this case does not warrant the extension of the narrow band of cases in which this court has applied a much broader standing analysis to vagueness challenges. *See Seven Thirty–Five East Colfax, Inc.*, 697 P.2d at 356 (applying overbreadth standing analysis to a vagueness challenge of criminal statutes regulating obscenity); *City of Englewood*, 671 P.2d at 951 (holding that in criminal cases where the law reaches a "substantial amount of constitutionally protected conduct," court may apply overbreadth standing analysis to vagueness challenges). Therefore, we apply our well-established rules of standing and hold that the Plaintiffs do not have standing to challenge section 12–47.1–804(1) on vagueness grounds.

V.

We hold that neither the Plaintiffs' right of access to the ballot or to office nor a voters' right of choice of candidates is impermissibly

claims whether brought under the First Amendment or art. II, § 10. *Id.*

18. Schmalz argues that § 12–47.1–804(1) is vague as applied to him because at the time he resigned from office he did not hold a direct interest in a license. We find this argument to be without merit. Schmalz admits that the reason he resigned was because the Commission informed him that it would not grant a gaming license to a corporation which was leasing property from him. Whatever the vagaries of § 12–47.1–804(1) may be, leasing property to a gaming establishment clearly creates an indirect interest in a license.

burdened by section 12–47.1–804(1). The State has a legitimate basis for the imposition of restrictions on those rights in order to preserve both propriety and the appearance of propriety in local government and the gambling industry. Therefore, we affirm the trial court's order granting the State's motion to dismiss.