Dear Stephen L. Martino
On behalf of the State Lottery Commission (the "Lottery Commission" or the "Commission"), you have asked whether the Commission may order a video lottery terminal ("VLT") facility licensee, Penn Cecil Maryland, Inc., and its parent company, Penn National Gaming (collectively "PNG"), to cease funding the opponents of an Anne Arundel County referendum. The referendum, if successful, would validate a County zoning ordinance that permits construction of a VLT facility adjacent to Arundel Mills Mall, a facility that PPE Casino Resorts Maryland, Inc. ("PPE") proposes to build and operate.
In our view, the Lottery Commission has the power to enforce the conflict-of-interest and duty-to-cooperate provisions in the Request for Proposals for Video Lottery Operation Licenses 2009-0101 (the "RFP"). However, the Commission may not order PNG to cease funding opposition to the referendum because (a) the RFP provisions at issue do not prohibit PNG's referendum-related activities; (b) the General Assembly has not authorized the Commission to regulate VLT licensees' campaign contributions; and (c) a court would likely find such an order unconstitutional with respect to a referendum.
 I Background
As a result of legislation enacted during the General Assembly's 2007 Special Session and the ratification of a constitutional amendment in 2008, the State has authorized the licensing and operation of VLT facilities in five designated locations *Page 178 
throughout Maryland, including one location in Cecil County and one in Anne Arundel County. See Annotated Code of Maryland, State Government Article ("SG") §§ 9-1A-01, et seq. (the "VLT Statute"); Md. Const., Art. XIX (the "VLT Amendment").[1] The VLT Amendment required that a VLT facility must "comply with all applicable local planning and zoning laws." Id.
Under the VLT Statute, the Video Lottery Facility Location Commission (the "Location Commission") selects entities to be awarded licenses to operate VLT facilities, and the Lottery Commission ultimately issues the license and regulates the operation of the VLT facility by the licensee. See
SG §§ 9-1A-02, 9-1A-04, 9-1A-24, 9-1A-25, 9-1A-36(n). On October 21, 2009, the Location Commission selected PNG for the Cecil County location and, on September 16, 2010, the Lottery Commission issued PNG a video lottery facility operator license, subject to certain conditions that were fulfilled soon thereafter. On September 27, 2010, PNG announced the opening of Hollywood Casino Perryville.
The Location Commission selected PPE for the Anne Arundel County license on December 7, 2009, based on PPE's proposal to construct a facility near Arundel Mills Mall. At the time of the Commission's decision, however, Anne Arundel County zoning laws did not permit a VLT facility in the proposed location. After vigorous debate, the Anne Arundel County Council enacted Bill No. 82-09, a zoning ordinance that allows a VLT facility as a "conditional use" at the site adjacent to Arundel Mills where PPE had proposed to construct the facility.
Soon thereafter, opponents of locating the VLT facility near Arundel Mills Mall mounted a petition drive to place Bill 82-09 on the ballot for the 2010 election as a local referendum. The petition drive succeeded in collecting sufficient signatures to place the referendum on the ballot. PPE filed an action seeking to enjoin the certification of the ballot measure, but the Court of Appeals ultimately rejected PPE's arguments, and the Anne Arundel County Board of Elections has certified the ballot question. A robust political debate over the referendum is now underway in Anne Arundel County, and PPE is funding support of the referendum, while PNG is funding opposition. *Page 179 
PPE has asked the Lottery Commission to order PNG to cease funding the opponents of the referendum, asserting that PNG's activities violate the conflict-of-interest and duty-to-cooperate provisions of the RFP. PPE has complained that PNG's interests in its facilities in Cecil County and Charles Town, West Virginia (and an alleged interest in obtaining a second slots license for Laurel Park) conflict with the State's interest in the prompt establishment of a VLT facility in Anne Arundel County. PPE also complained that PNG is not cooperating with another facility licensee, PPE, to accomplish the Lottery Commission's objective of the prompt establishment of a VLT facility in Anne Arundel County.
After receiving correspondence from counsel for PPE and PNG, the Commission considered at its September 16, 2010, meeting whether to take action against PNG, prompting this request for advice on whether the Commission has, and may lawfully exercise, the power to enter an order directing PNG to cease its referendum-related activity.
 II Lottery Commission's Authority to Enforce the RFPProvisions
Both the Location Commission and the Lottery Commission are charged with advancing "the public['s] vital interest in video lottery operations . . .," SG § 9-1A-18, an interest that includes establishing and opening VLT facilities and maximizing revenues from those facilities. However, the same legislation that encouraged the State's VLT program to grow as quickly as possible also subjected the program to detailed and comprehensive regulation.
Accordingly, the VLT Statute mandates a regulatory scheme that affords the Lottery Commission broad authority to superintend, among other things, the conduct of licensees, contractors, and others involved in the implementation of VLT operations in Maryland. SG § 9-1A-02. Towards this end, the Commission has the power to deny a license to an applicant; reprimand or fine a licensee; or suspend or revoke a license for a violation of the subtitle, a regulation adopted under that subtitle, or a condition set by the Commission.See SG § 9-1A-25. In carrying out its licensing and regulatory functions, the Commission is authorized to investigate and adjudicate violations by *Page 180 
examining licensees' books and records, issuing subpoenas, taking testimony under oath, conducting hearings pursuant to regulations, and other means. See SG § 9-1A-04.
The licensees are not only subject to the Commission's close regulation, but must also assume a number of affirmative, continuing obligations, including an obligation "to provide to the regulatory and investigatory authorities . . . any assistance or information necessary to assure that the policies" of the VLT Statute are achieved, SG § 9-1A-18(a); a "continuing duty" to "cooperate in an inquiry, investigation or hearing conducted by the Commission," SG § 9-1A-07(c)(4); and a continuing obligation to comply with the RFP terms, which are incorporated into the license application and the license itself. See COMAR 14.01.11.06A; RFP § 1.1.6 ("All terms and requirements of this RFP shall be incorporated into and become a part of the License.") Of particular relevance here are the continuing obligations to comply with the RFP terms requiring licensees (a) to resolve any real or perceived conflicts of interest during the term of the license, when so directed by the Commission, see RFP § 4.20, and (b) to cooperate with "any subsequent licensee, contractor or any other contractor designated by the Lottery Commission to accomplish the Lottery Commission's objectives." RFP § 4.25.
Because the Commission is authorized to enforce continuing obligations found in the RFP, it is our view that the Commission has the power to enter proper orders enforcing the conflict-of-interest and duty-to-cooperate provisions at issue here. This conclusion, however, does not end the inquiry, but raises the questions (a) whether PNG's political advocacy in opposition to the zoning ordinance violates the meaning of the RFP provisions; (b) whether the Legislature has authorized the Commission to regulate election-related activities of its licensees; and (c) whether theFirst Amendment to the Constitution of the United States and Article 40 of the Maryland Declaration of Rights[2] would permit the entry of an order directing PNG to cease its advocacy in Anne Arundel County. *Page 181 
As explained below, PNG's conduct does not violate the RFP terms, and the Legislature has not delegated authority to the Commission to regulate election-related activities of its licensees; even if it had, it is likely that a court would find that theFirst Amendment would protect PNG's advocacy, and that the Commission could not lawfully exercise its powers to order PNG to cease its involvement in the debate over the Anne Arundel County referendum on zoning for an Arundel Mills VLT facility.
 III RFP Provisions
A. The Conflict-of-Interest Provision
The conflict-of-interest provision found in Section 4.20 of the RFP states:
 The Licensee shall ensure that there is no real or perceived conflict of interest at any time during the term of the License. If the Licensee has any gaming-related affiliations which would be perceived as improper in its alliance to the Lottery Commission at the time of License award, or any such conflicts arise during the term of the License, the Licensee shall notify the Lottery Commission of such conflicts.
 The Lottery Commission shall make the final determination as to whether any activity constitutes a conflict of interest, pursuant to this provision. The Lottery Commission's decision shall be final and without recourse; however, the Lottery Commission will not make any such decision without providing the Licensee with an opportunity to present comments. Failure of the Licensee to resolve such conflicts upon notification by the Lottery Commission that a conflict exists, shall constitute a material breach of the License, and the License is subject to termination by the Lottery Commission. *Page 182 
Citing this language, PPE asserts that PNG's "activities to prevent competition with its facilities in Cecil County and Charlestown, West Virginia, and its alleged interest in obtaining a second slots license for Laurel Park, conflict with the State's interest in the prompt establishment of a VLT facility in Anne Arundel County." Letter from James L. Shea to John B. Howard, Jr., dated September 22, 2010. PPE presented this argument to the Lottery Commission in previous correspondence and at the September 16, 2010, meeting. At that meeting, the Commission took no
administrative action again PNG, but a number of commissioners expressed their view that a VLT facility should be established at Arundel Mills as soon as possible and their unhappiness with PNG's activities in financing the opponents of the Arundel Mills location.
Regardless of the effect PNG's activities may have on the establishment of a VLT facility at Arundel Mills, those activities do not fall within the scope of Section 4.20's conflict-of-interest provisions and do not provide legal grounds for the Lottery Commission to take licensing action against PNG for an alleged violation of Section 4.20. This section concerns a licensee's or prospective licensee's interests — in particular, other gaming-related affiliations — that may be, or appear to be, in conflict with the licensee's performance of its obligation to the State to operate, and generate revenues from, the particular facility the licensee is licensed to operate. Section 4.20 doesnot mean that a licensee is forbidden from pursuing its other gaming-related interests, as long as they are disclosed and do not compromise the licensee's commitment to fulfill its obligations to the State to operate a VLT facility.
Other provisions of the RFP, and consideration of the consequences of a broader reading of Section 4.20, confirm this interpretation. Although Section 4.20 itself does not define what conflicts of interest it encompasses, Section 4.31 helps to clarify what a conflict of interest in this context means. That section provides that a "Licensee agrees that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of its serviceshereunder." (emphasis added). In other words, the VLT operator licensee must perform — free from any undisclosed or unresolved conflict of interest — the array of services involved in running a successful VLT facility.[3] There is no allegation that PNG has not *Page 183 
fully disclosed all relevant financial interests, and there is no allegation that those interests, or PNG's participation in an Anne Arundel County referendum, pose a conflict with PNG's performance of the services required to operate the Cecil County VLT facility.
We reject any suggestion that this interpretation loses sight of the "big picture" — i.e., that we fail to appreciate the State's interest in generating the most possible revenue through its VLT program and that, in furtherance of this objective, the Commission has the power to order a licensee to cease any activity that might conflict with Maryland's objective of maximizing VLT revenues. If that is what the conflict-of-interest provision was intended to cover, then there is a direct and inescapable conflict between PNG's interest in maximizing revenues from Hollywood Casino in Charles Town, West Virginia, and the State's interest in maximizing revenues from all Maryland facilities. Simply stated, Maryland wants its citizens and others to bet at Maryland VLT facilities, while PNG wants those same citizens (at least those who do not bet in Cecil County) to bet at PNG's West Virginia facility, depriving Maryland of potential VLT revenue. Ordering PNG to cease participating in the Anne Arundel referendum will not "resolve" any alleged conflict of interest. Nor does PNG's participation in the Anne Arundel County referendum somehow create an impermissible conflict of interest where none existed before.
In short, PNG committed to the State that it would perform services required by its operation license at the Cecil County VLT facility and would disclose or resolve any real or perceived conflicts of interest that would adversely affect its commitment to perform those services. As we explain below, even if the conflict-of-interest *Page 184 
provisions were interpreted to cover PNG's financing of the opposition to a VLT facility at Arundel Mills, an order directing PNG to cease advocating that viewpoint through lawful campaign expenditures would likely be unconstitutional.
B. The Duty-to-Cooperate Provision
The duty to cooperate provision found in Section 4.25 states:
 The Licensee shall cooperate with any subsequent licensee, contractor or any other contractor designated by the Lottery Commission to accomplish the Lottery Commission's objectives.
PPE contends that this provision does not merely require PNG, as a VLT operation licensee, to cooperate with subsequent licensees and contractors working with PNG to operate the Cecil County VLT facility; rather, PPE asserts, "cooperation is required whenever it is necessary `to accomplish the Lottery Commission's objectives'" and, because "[t]he Commission's objectives include the prompt establishment of a VLT facility in Anne Arundel County," PNG "is required to cooperate to accomplish that objective." Letter from James L. Shea to Kirby M. Fowler, Jr., dated September 10, 2010 (internal citation omitted).
The duty-to-cooperate provision in Section 4.25, standing alone, does not specify the nature of the cooperation contemplated. Read in the context of the other commitments imposed on licensees, the duty to cooperate in Section 4.25 plainly refers to cooperation among licensees and contractors in the operations of a given VLT facility and, in particular to cooperation between initial licensees and successor licensees and contractors. Because these parties' duties run to the State, and not to each other, the cooperation clause ensures that all parties will work together if there is a transition to a new licensee or contractor. Throughout the RFP, various provisions address cooperation among licensees and contractors for the purpose of operating a particular VLT. In contrast, we discern no provisions suggesting that one licensee or contractor must work together on non-operational matters, much less provisions relating to one video lottery operator's obligations to another with respect to local zoning, licensing issues, or other matters concerning the establishment of a new facility. *Page 185 
In various places, the RFP describes the contractors and licensees who must work cooperatively — even when the relationship is a "forced marriage" as a result of the State procuring a contractor to work with the licensee. The duty of cooperation ensures that the parties must work together to accomplish the objective of running a VLT facility. For example, RFP § 1.1.9 provides, in relevant part that:
 VLTs, Central Monitor and Control System ("Central System"), and the Associated Equipment and software . . . will be obtained through separate procurements . . . by the Lottery Commission. The Lottery Commission may award contracts to more than one manufacturer of VLTs and a Facility may have VLTs from more than one manufacturer installed. Licensee shall work in cooperation with the VLT contractor, Central System contractor, and any other Lottery Commission or Lottery contractors to insure smooth implementation of all systems.
(emphasis added).
A specific illustration of such cooperation appears in RFP § 6.7.4, which provides, inter alia, that the licensee "shall . . . [p]rovide for the Central System contractor, at no cost: computer room space; HVAC, power and back-up power; cable infrastructure access to VLT floor; storage area for spare equipment"; "[p]rovide for the VLT contractor(s), at no cost: storage area for spare equipment"; "[p]rovide all necessary wiring for gaming floor that is needed for the licensee's operations, except for such wiring that may be performed by contractor of the Lottery Commission"; and so forth. Immediately following that Section, RFP § 6.7.5 restates the general duty of cooperation among licensees and contractors: "The Licensee shall work in cooperation with the VLT contractor(s), Central System contractor, and any other Lottery Commission or Lottery contractors to insure smooth implementation of all systems."
Read in conjunction with these provisions, Section 4.25's duty-to-cooperate language — "The Licensee shall cooperate with any subsequent licensee, contractor or any other contractor designated by the Lottery Commission to accomplish the Lottery Commission's objectives" — refers to cooperation with respect to the operation of a facility; the duty to "subsequent" licensees and contractors is *Page 186 
primarily intended to ensure a facility's smooth functioning during the transition from a licensee to a subsequent licensee or when the Commission has contracted with a new party, other than an operation licensee, to work at a particular facility.
It is true, however, that Section 4.25's cooperation language includes the phrase "to accomplish the Lottery Commission's objectives," a phrase not found in the other duty-to-cooperate provisions. In this context, though, we think it is clear that the relevant "objective" is that of keeping the facility open and running smoothly, efficiently, and in accordance with the objectives of the VLT law, not the Commission's broader objective of expeditiously opening VLT facilities in the various areas designated in the State Constitution.
The Commission's role with respect to the broader objective of opening facilities as promptly as possible includes ensuring that facilities comply with local zoning laws, and the determination of what zoning laws apply is committed to the local jurisdictions. The Commission has no role in formulating or overseeing the process by which zoning laws are adopted or applied. Indeed, although the General Assembly need not have required compliance with local zoning, one of the key compromises enabling the VLT facility amendment to pass and obtain ratification was deference to localities on zoning rules.
Therefore, however cumbersome and protracted the process of resolving the zoning issue in Anne Arundel County may seem to be, the Commission is required to defer to that process. And the process has been unfolding in conformance with Maryland law, the Maryland Constitution, and the United States Constitution: the Anne Arundel County Council enacted a zoning ordinance; a sufficient number of citizens of Anne Arundel County petitioned the ordinance to referendum (and the Court of Appeals held that the ordinance was referable); and, now, the people of Anne Arundel County are engaged in an intense political debate over the wisdom of the zoning ordinance, a debate in which everyone — including financially-motivated gaming entities such as PPE and
PNG — are entitled to participate. Ultimately, the people will decide the issue at the ballot box. *Page 187 
In short, Section 4.25 does not impose on a VLT licensee an obligation to cooperate with a licensee in another jurisdiction in the other licensee's establishment of a VLT facility in the other jurisdiction. Rather, Section 4.25 and other provisions of the RFP contemplate cooperation in operating and maintaining operations at a particular facility, a clear objective of the Lottery Commission.
 IV Lottery Commission Authority to Regulate Licensee Campaign Contributions
As an initial matter, the VLT Statute does not provide the Lottery Commission with any express power to regulate campaign contributions, and no power to do so may be implied from the VLT Statute. If the General Assembly had intended to grant the Commission such authority, it could be expected to have done so in the same 2007 legislation that enacted the provisions now codified in the VLT Statute. That legislation, Senate Bill 3 of the 2007 Special Session ("SB3"), not only established the operational and regulatory framework for the VLT program, but also amended provisions of the State Election Law. Section 10 of SB 3 required that ballot issue committees formed to support or defeat the VLT Amendment file additional campaign finance reports and imposed disclosure and reporting requirements on corporations that made independent expenditures supporting or opposing the VLT Amendment.
The general power to license and regulate VLT operation licensees does not include the authority to regulate political speech through licensing actions. Cf. Citizens United v. Federal ElectionComm'n, 130 S.Ct. 876, 905 (2010) (rejecting proposition that state may require forfeiture of fundamental right to engage in political speech in exchange for granting "special advantages," such as limited liability, to corporations). Similarly, the conflict-of-interest and duty-to-cooperate provisions do not contain any language, much less clear language, concerning a waiver ofFirst Amendment rights. Fuentes v. Shevin,407 U.S. 67, 95 (1972) ("[A] waiver of constitutional rights in any context must, at the very least, be clear," and is ineffective "when the contractual language relied upon does not, on its face, even amount to a waiver"). *Page 188 
 V First Amendment Limitations
It has long been established that a corporation has aFirst Amendment right to fund a campaign supporting or opposing a referendum. First National Bank of Boston v. Bellotti,435 U.S. 765 (1978). Limits on referendum-related expenditures require a more compelling justification than limits on contributions to candidates for office because "[r]eferenda are held on issues, not candidates for public office" and, therefore, "[t]he risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue."Id. at 790. In addition, an order requiring PNG to cease its funding of the opposition to the referendum, while allowing PPE to continue funding support for the referendum, would likely be found to amount to impermissible viewpoint discrimination. When governmental "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended."Id. at 785-86.
Cases involving the regulation of "commercial speech" have no application in this context. Corporate speech related to a referendum may be assumed to have an "economic motivation," but that does not transform what is otherwise protected political speech into "commercial speech," which enjoys less constitutional protection. See Bolger v. Young's Drug Products Corp.,463 U.S. 60, 67 (1983); Va. State Bd. of Pharmacy v. Va. CitizensConsumer Council, Inc., 425 U.S. 748, 762 (1976) (commercial speech "does no more than propose a commercial transaction"). Commercial speech is analyzed under an "intermediate level of scrutiny" that is "a far cry from strict scrutiny" applied to restrictions burdening political speech, where the government interest must be "compelling" and the regulation "narrowly tailored" to serve that interest. City of Cincinnati v. Discovery Network,Inc., 507 U.S. 410, 434 (1993)(Blackmun, J., concurring).
There can be no serious contention that PNG's (presumably economically motivated) political activity opposing the referendum somehow "proposes a commercial transaction" and that an order restraining that activity can therefore be justified on the same grounds that justify advertising restrictions on gaming companies. *Page 189 
Thus, cases involving restrictions on commercial speech to advance a legitimate state interest in regulating so-called "vice activities" such as gaming are irrelevant. See, e.g., Posadas dePuerto Rico Associates v. Tourism Co. of Puerto Rico,478 U.S. 328 (1986) (upholding restrictions on casino advertising in light of the substantial state interest in protecting "the health, safety, and welfare" of Puerto Rico residents by "reduc[ing] demand for casino gambling"). Posadas and other cases following it involved
commercial speech restrictions to minimize "vice activities," including gaming. Here, the question is whether a State interest inmaximizing its own gaming revenues is proffered to justify banning core political speech. In other words, the governmental interest in protecting the welfare of its citizens that has traditionally justified commercial speech restrictions on "vice activities" such as gambling can hardly justify restricting political speech that allegedly interferes with the full flourishing of those same "vice activities."
Also irrelevant are cases that have upheld statutory restrictions on contributions by gaming interests to political candidates.See, e.g., Casino Assoc. of Louisiana v. State,820 So.2d 494 (La. 2002); Soto v. State,565 A.2d 1088 (N.J. 1989); Lorenz v. State,928 P.2d 1274, 1282 (Col. 1996). It is well established that limits on contributions to candidates for office can be justified by the important governmental interest in "the prevention of corruption and the appearance of corruption" that would ensue if unlimited contributions to a candidate that limits on contributions to candidates passed Buckley v. Valeo, 424 U.S. 1 (1976). Here, PNG is not supporting any candidate. It is advocating a position in a political debate.
 VI Conclusion
In our view, the Lottery Commission has the authority to enforce violations of provisions of the RFP. The Commission may not, however, order PNG to cease funding opposition to the referendum on the Anne Arundel County zoning ordinance because the provisions at issue do not prohibit PNG's such funding; because the General Assembly has not authorized the Commission to regulate VLT licensees' campaign contributions; and because a court would *Page 190 
likely find an order to cease funding opposition to the referendum unconstitutional.
Douglas F. Gansler Attorney General
John B. Howard, Jr. Deputy Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] The other designated locations are in Baltimore City, Rocky Gap State Park, and Worcester County.
[2] Article 40 of the Maryland Declaration of Rights provides in pertinent part "that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." In the context here, Article 40 provides at least as much protection as theFirst Amendment.
[3] Thus, for example, RFP § 3.20 holds a licensee "responsible for all products, equipment and services required by this RFP"; RFP § 4.11 provides that an operator licensee "may not subcontract any portion of the services provided under [its] License" without prior Commission approval and if the licensee "contracts with another person other than an employee of the Operation Licensee to provide any of the services related to operating a Facility," that person must meet certain standards; RFP § 4.28 requires the VLT operator insure "itself and any subcontractor" against "claims arising from the operations and services provided under this License." *Page 191