NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0090n.06
Filed: February 1, 2008

No. 06-4042

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RICHARD EARLE,

                Plaintiff-Appellant,            ON APPEAL FROM THE
                                           UNITED STATES DISTRICT
v.                                       COURT FOR THE SOUTHERN
                                         DISTRICT OF OHIO

NETJETS AVIATION INC.,

                Defendant-Appellee.

_____/

BEFORE: BOGGS, Chief Judge; GIBBONS, Circuit Judge; and BELL, Chief District Judge.[*]

      **PER CURIAM.** Plaintiff-Appellant Richard Earle appeals the district court's decision affirming an arbitration award in favor of Defendant-Appellee NetJets Aviation Inc. ("NetJets"). Earle had grieved NetJets' termination of his employment, as well as the suspension that preceded his termination. Both grievances were submitted to arbitration, and the arbitrator denied both grievances. Earle contends that the district court improperly affirmed the arbitrator's denial of both grievances. For the reasons set forth below, we affirm the judgment of the district court.

---

      [*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

I.

NetJets operates and maintains a fleet of fractional-ownership business jet aircraft. NetJets is based in Columbus, Ohio, but operates through a gateway system. The gateway system enables pilots to start and end a seven-day tour of duty at a location other than Columbus. NetJets' pilots are represented by Teamsters Local 284 ("Local 284"). Earle's employment with NetJets was governed by a collective bargaining agreement ("CBA") between NetJets and Local 284.

NetJets had employed Earle as a pilot since April 1994. Earle's gateway airport was in Jacksonville, Florida. An August 3, 2000, agreement between NetJets and Local 284, referred to as the Gateway Letter of Understanding, states that "[i]n order to be in position to commence duty, crewmembers utilizing Gateways must be within 100 miles of the Gateway or be within three (3) hours drive time of the Gateway, whichever is shorter." (J.A. at 291.)

On December 17, 2001, the first day of a seven-day tour of duty for Earle, NetJets Anti-Drug and Alcohol Technician Rita Lohr called Earle at 8:10 a.m. and instructed him to report for a random drug and alcohol test at a third-party testing facility one mile from the Jacksonville airport. Earle advised Lohr that he was in Tallahassee, Florida, and that it would take him four hours to reach the testing facility. On the first day of the arbitration hearing, December 19, 2002, Earle acknowledged that he was actually at his home in Pensacola, Florida, when he received the phone call from Lohr. Pensacola is approximately 350 miles from the Jacksonville airport. Earle arrived at the testing facility at 2:00 p.m., five

hours and fifty minutes after the phone call from Lohr. Earle submitted to the test, which did not detect either drugs or alcohol. On December 21, 2001, NetJets Chief Pilot Jim Peters placed Earle on an unpaid suspension because Earle's delay in reaching the testing facility was deemed a constructive refusal to submit to a drug and alcohol test. NetJets also notified the Federal Aviation Administration of the events related to Earle's December 17 test. On December 26, 2001, Earle grieved the suspension. On January 3, 2002, NetJets held a meeting with Earle and terminated his employment. Later that day NetJets sent Earle a letter confirming the termination of his employment because, among other reasons, NetJets had determined that on December 17 Earle "failed to comply with the requirements of the Company's FAA-required Alcohol Misuse Prevention Program (see Section 2.4 of the [CBA] and 49 CFR Subpart N, Section 40.261(a)(1)[)]." (J.A. at 39.) On January 4, 2002, Earle grieved the termination of his employment. It was not until the first day of the arbitration hearing that Earle admitted that he had been in Pensacola, having previously lied at the December 21 meeting by saying that he had been at a Tallahassee hotel room, much closer to the Jacksonville airport. The grievances were then submitted to arbitration and an arbitration hearing was held over the course of three days, December 19, 2002, March 18, 2003, and May 20, 2003. Although NetJets cited four reasons for terminating Earle's employment in the January 3 letter, the arbitrator only considered NetJets' aforementioned constructive refusal rationale. (J.A. at 42-43, 47, 49, 166 n.1.) The arbitrator denied Earle's grievances on September 30, 2003.

II.

A.

"When a district court decides to confirm or vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error." *Int'l Bhd. of Teamsters, Local 519 v. United Parcel Serv., Inc.*, 335 F.3d 497, 503 (6th Cir. 2003) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995)). The review of this labor arbitration award is governed by the Railway Labor Act, 45 U.S.C. §§ 151-188.

B.

In deciding whether to confirm or vacate a labor arbitration award, a federal court must ask:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"? So long as the arbitrator does not offend any of these requirements, the request for judicial intervention should be resisted even though the arbitrator made "serious," "improvident" or "silly" errors in resolving the merits of the dispute.

*Mich. Family Res., Inc. v. SEIU Local 517M*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc).[1]

There is no dispute that the arbitrator's decision complies with the requirements of the first two inquiries; however, Earle contends that the arbitrator was not "arguably construing or applying the contract."

---

[1] Although the district court did not have the benefit of this Court's en banc decision in *Michigan Family Resources*, we apply it now as it is the law of this Circuit.

Section 2.4 of the CBA limited NetJets to discharging employees for "just cause." (J.A. at 189.) On January 1, 1995, NetJets implemented an Alcohol Misuse Prevention Program ("AMPP") that, among other things, required NetJets' pilots to submit to random alcohol testing. (*Id.* at 329, 332.) The AMPP states that a NetJets employee "who refuses to submit to any required alcohol test in this program, will be subject to termination." (*Id.* at 332.) The arbitrator determined that a violation of the AMPP constituted "just cause" under section 2.4. (*Id.* at 49.) The arbitrator then determined that Earle's five-hour-and-fifty-minute delay in reaching the testing facility on December 17, 2001, constituted a refusal to take a drug and alcohol test in violation of the AMPP. (*Id.*) Thus, the arbitrator concluded that NetJets acted within its authority under the CBA to discharge Earle for a violation of the AMPP. (*Id.*) In so reasoning, the arbitrator's seventeen-page decision "refers to, quotes from and analyzes the pertinent provisions of," *Mich. Family Res.*, 475 F.3d at 754, the CBA, the AMPP, the Gateway Letter of Understanding, and 49 C.F.R. § 40.261(a)(1).[2]

Earle contends that the arbitrator was not "arguably construing" the CBA because, in Earle's view, he was not obligated to submit to a drug and alcohol test under the AMPP on December 17 until he arrived at his work site, the Jacksonville airport. Earle bases this contention on the notion that there are three predicates that must be satisfied before an employee was obligated to submit to a random drug and alcohol test: "the employee must (1) be at the work site, (2) have reported for work, *and* (3) be performing, ready to perform

---

[2]The AMPP, the Gateway Letter of Understanding, and 49 C.F.R. § 40.261 are all incorporated by reference in the CBA. (J.A. at 34-35, 41-42.)

or immediately available to perform safety-sensitive functions." (Appellant's Br. 17.) Earle contends that because the arbitrator found that he was not at a work site at 8:10 a.m on December 17 the arbitrator could not have "arguably construed" the contract to require him to submit to a drug and alcohol test. Although Earle is correct that the arbitrator found that Earle was at his home in Pensacola, Florida, at 8:10 a.m. on December 17, the arbitrator did not find that pilots were only subject to drug and alcohol test after arriving at a work site (e.g., their assigned gateway airport).

The arbitrator specifically considered Earle's contention that he was not at his work site, the Jacksonville airport, when Lohr notified him of the test on December 17. The arbitrator concluded that the AMPP did not address the question of how NetJets was to notify a pilot who participated in the gateway system that he or she had been selected for a random drug and alcohol test. (J.A. at 48.) Earle contends that the arbitrator's conclusion is contrary to the following sentence in the AMPP: "Employees will only be tested for alcohol while they are at the work site (this could include airports other than our home base)." (*Id.* at 330.) Earle contends that, in consideration of this language, there was no gap or ambiguity in the AMPP related to notification, because pilots were not subject to testing until they reached the work site. Although the foregoing sentence acknowledges that testing may take place at facilities other than NetJets' Columbus, Ohio, headquarters, the AMPP does not address the process for testing a pilot who is on a seven-day tour of duty and who uses a gateway airport. Thus, the AMPP did not address notification, so it was permissible for the arbitrator to

consider the past practices of the parties. *Int'l Bhd. of Teamsters, Local 519*, 335 F.3d at 507-08.

The arbitrator considered the testimony of three witnesses, Lohr, Mitchell Michel, and Richard Smith, as to NetJets' custom and practice for notifying a pilot who is on a seven-day tour of duty and who uses a gateway airport that he or she has been selected for a random drug and alcohol test. (J.A. at 48-49.) Lohr and Smith described a notification procedure by which Lohr would notify a pilot using the gateway system at home on the first day of his or her tour of duty and direct the pilot to a testing facility close to his or her gateway airport. (*Id.*) The practice set forth by Lohr and Smith was consistent with the process NetJets had used to notify Earle of his test on December 17. (*Id.*) The arbitrator concluded that NetJets' practice as set forth by Lohr and Smith did not conflict with the "work site" language in the AMPP.[3] (*Id.*) Thus, the district court correctly concluded that the arbitrator did not impose any additional terms; rather, the arbitrator properly considered the implementation of the agreements through custom and practice after having determined that the agreements did not address the question of how to administer drug and alcohol tests to pilots who used a gateway airport.

---

[3]Lohr and Smith supported NetJets' account of the notification process for pilots using the gateway system, while Michel supported Earle's interpretation of the notification process permitted by the AMPP. The arbitrator credited the testimony of Lohr and Smith, based in part on the fact that NetJets had been using the notification procedure described by Lohr and Smith for some time and Local 284 had never grieved the notification procedure. (J.A. at 48-49.)

The arbitrator also addressed the question of whether a delay in reaching a testing facility could constitute a constructive refusal of a random drug and alcohol test. The arbitrator determined that when the AMPP was read in conjunction with 49 C.F.R. § 40.261(a)(1),[4] "it is understood that to not appear at an alcohol and drug testing site 'within a reasonable time' after being directed to do so is the equivalent of a refusal to take an alcohol and drug test." (J.A. at 42-43.) The arbitrator then considered whether the five hours and fifty minutes that it took Earle to reach the testing facility on December 17 was a "reasonable time" and concluded that it was not reasonable. (*Id.* at 43.) In finding the five hours and fifty minutes to be unreasonable, the arbitrator considered the definition of reasonable, the importance of promptness in the conduct of drug and alcohol tests, and Earle's justifications for his delay in reaching the testing facility. (*Id.* at 43-44.) The arbitrator noted that Earle had offered justifications (e.g., traffic congestion) for the delay of five hours and fifty minutes, which the arbitrator noted was an implicit acknowledgment that five hours and fifty minutes was unreasonable in the absence of a sufficient justification. (*Id.* at 43.)

---

[4]Title 49, section 40.261(a)(1) of the Code of Federal Regulations provides in relevant part that:

> (a) As an employee, you are considered to have refused to take an alcohol test if you:
>> (1) Fail to appear for any test (except a pre-employment test) within a reasonable time, as determined by the employer, consistent with applicable DOT agency regulations, after being directed to do so by the employer.

49 C.F.R. § 40.261(a)(1) (2001) (current version at 49 C.F.R. § 40.261(a)(1) (2007)).

In consideration of the arbitrator's reference to and analysis of the CBA, the AMPP, the Gateway Letter of Understanding, and 49 C.F.R. § 40.261(a)(1) there is no indication that the arbitrator "was doing anything other than trying to reach a good-faith interpretation of the contract." *Mich. Family Res.*, 475 F.3d at 754. Therefore, the arbitrator was "arguably construing" the CBA together with the incorporated agreements and Federal Regulations, and the arbitration award must be enforced.

III.

For the foregoing reasons, we AFFIRM the judgment of the district court.