James TURNEY, Plaintiff–Appellant,

v.

CIVIL SERVICE COMMISSION of the City and County of Denver and City and County of Denver, a municipal corporation, Defendants–Appellees.

No. 08CA0215.

Colorado Court of Appeals, Div. II.

April 16, 2009.

Bruno, Colin, Jewell & Lowe, P.C., Douglas Jewell, Denver, Colorado, for Plaintiff–Appellant.

David R. Fine, Denver City Attorney, Karla J. Pierce, Assistant City Attorney, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge CONNELLY.

Denver Police Officer James Turney challenges his ten-month suspension for tactical errors preceding his fatal shooting of a developmentally disabled fifteen-year-old boy who had been wielding a knife. Denver's Civil Service Commission, reversing an administrative hearing officer, upheld the suspension. Turney sought judicial review under C.R.C.P. 106(a)(4); the district court affirmed the commission; and Turney now appeals.

Though the shooting itself was not alleged to have violated the department's use-of-force policy, Turney was suspended for violating a provision requiring that officers "maintain the highest standard of efficiency and safety." The commission disagreed with the hearing officer's determination that this provision could not constitutionally be applied to Turney. It upheld the suspension because Turney had "disregarded the opportunity to de-escalate" the situation prior to the shooting.

Turney contends the "highest standard of efficiency and safety" provision is unconstitutionally vague, and that the commission exceeded its authority, applied the wrong legal standard, and made other legal and factual errors. We affirm the judgment upholding the suspension.

## I. Background

### A. The Police Response and Shooting

On the afternoon of July 5, 2003, the sister of fifteen-year-old Paul Childs called "911" from her Denver home. She reported that Paul was trying to stab their mother with a long, butcher-style knife because the mother had locked the doors to the home so Paul could not run away. A dispatcher relayed this information to several police units.

Four officers responded within minutes of each other. Turney arrived first, so he was the "primary" officer while the others were "cover" officers.

Turney approached the home carrying a firearm, and a second officer approached carrying a non-lethal "taser" device. The mother reported from the front door that Paul still had the knife, and Turney instructed everyone to leave the home. Six occupants (including the mother and sister) exited through the front door, leaving Paul alone inside.

After everyone but Paul left the home, Turney remained on the porch holding an outer security door ajar with his foot. The inner wooden door remained open.

A second officer, who retreated from the porch, told Turney that Paul was holding a knife behind the open wooden door. Turney did not release the outer security door; he ordered Paul to drop the knife and come out with his hands up. Other officers yelled similar commands. Paul did not heed those commands.

Paul, still carrying a knife, proceeded toward Turney. Turney fired several shots, striking Paul in the chest, shoulder, and abdomen. Paul was rushed to a hospital and later pronounced dead from the gunshot wounds.

### B. The Denver Police Department Rules and the Suspension

The Denver Manager of Public Safety determined that Turney's actions leading up to the shooting violated Police Department Rule and Regulation 102. RR–102 requires officers to "obey all departmental rules, duties, procedures, instructions, or orders, and the provisions of the Operations Manual." The manager imposed a ten-month suspension for this violation, as well as for unrelated and less serious violations not before us in this appeal.

The suspension letter stated the RR–102 violation pertained to Operations Manual § 3.13. Section 3.13 provides: "In carrying out the functions of the department, all members thereof shall direct and coordinate their efforts in such a manner as will establish and maintain the highest standard of efficiency and safety."

The manager did not find, and opined he could not properly have found, that the shooting violated the use-of-force policy as it then existed in Operations Manual § 105.00. Section 105.00(1) stated, "Department Policy as well as relevant Federal, State and Local laws shall govern use of force by officers." Subsections (2) and (3) went on to include lengthy citations to, descriptions of, and quotations from federal and state statutory and case law.

Subsection (1) of the policy further provided the department would support its officers' "lawful use of reasonable and appropriate force," but the "[u]se of force that is not lawful, reasonable and appropriate will not be tolerated." It stated: "The level of force applied must reflect the totality of circumstances surrounding the immediate situation." It explained officers "need only select a level of force that is within the range of 'objectively reasonable' options," but they "must rely on training, experience and assessment of the situation to decide an appropriate level of force to be applied. Reasonable and sound judgment will dictate the force option to be employed."

The manager testified that he, like his predecessors, construed the policy to cover only the immediate circumstances confronting an officer when force was used. The manager was unable to conclude Turney's shooting was unjustified in light of that temporal limitation.

The manager further concluded, however, that Turney made serious tactical errors preceding the shooting itself. He determined those errors violated Turney's Section 3.13 obligation to use "the highest standard of efficiency and safety" in performing police duties.

## C. The Hearing Officer Decision

Turney appealed the suspension to an administrative hearing officer. The hearing officer conducted a two-week hearing, in which many witnesses testified and many documents and tapes were introduced. The hearing officer ruled the relevant violation had not been sustained and reversed the ten-month suspension. He determined unrelated and less serious violations had been sustained, but that these other violations could support only a five-day suspension. These other rulings are not before us in this appeal.

The hearing officer concluded that "Section 3.13 cannot be relied upon to discipline Officer Turney because he was given no previous notice that this provision was intended to apply to tactical decisions in a deadly force context." His opinion "noted that no officer, prior to Officer Turney, ha[d] ever been disciplined under Section 3.13 … based upon a claimed faulty use of tactics that led to the use of force." This was so "even though there have been other instances, one as recently as May 2003, in which the [Denver Police] Chief concluded that the officers' poor choice of tactical options might have contributed to the use of deadly force." The hearing officer explained his conclusion was "based upon considerations of due process and innate fairness—no party should be punished for acts or omissions, unless he or she has been given prior notice that they may furnish a basis for punishment."

## D. The Commission Decision

The commission reversed the hearing officer and upheld the ten-month suspension. It wrote that "because Operations Manual § 3.13 unambiguously requires police officers to perform their job duties with the highest standard of safety, Officer Turney may not rely upon any due process theories to invalidate the discipline levied against him for [its] violation." And it added that "the training of a Denver Police Officer includes the skill and knowledge to assess whether he or she must escalate or de-escalate the use of force as the immediate situation changes."

The commission found Turney had "failed to understand the totality of the situation, and therefore disregarded the opportunity to

de-escalate the force after the situation had changed." It explained that once the others were evacuated from the home:

> Paul Childs neither posed any further threat to the family members, nor had he given any indication that he was a threat to himself. As a result, the immediate situation had changed; therefore requiring reassessment to a less threatening situation which would have resulted in the use of less force to remedy the matter.

The commission accordingly concluded that Turney violated Section 3.13 by "fail[ing] to maintain the *highest standard of efficiency and safety* for Paul Childs as well as for himself."

### E. The District Court Decision

The district court, citing the deferential standard of judicial review, affirmed. It concluded the commission had not exceeded its authority or committed any legal error, and that its determination was supported by the record.

## II. Discussion

 We must decide if the commission "exceeded its jurisdiction or abused its discretion" in upholding Turney's suspension. C.R.C.P. 106(a)(4). This includes review of whether the commission abused its discretion through "application of an erroneous legal standard." *Covered Bridge, Inc. v. Town of Vail*, 197 P.3d 281, 283 (Colo.App.2008). We "may defer" to but are "not bound by" the commission's construction of code provisions because our "review of the applicable law is de novo." *City of Commerce City v. Enclave West, Inc.*, 185 P.3d 174, 178 (Colo.2008). And we "review void for vagueness challenges de novo." *Zelenoy v. Colorado Department of Revenue*, 192 P.3d 538, 542 (Colo.App.2008). But our review of the underlying facts is deferential: we will set aside the decision on factual grounds only if the administrative record "is so devoid of evidentiary support that [the decision] can only be explained as an arbitrary and capricious exercise of authority." *Widder v. Durango School Dist. No. 9–R*, 85 P.3d 518, 526–27 (Colo.2004).

### A. The Due Process Void–for–Vagueness Challenge

 Turney contends the "highest standard of efficiency and safety" provision is unconstitutionally vague. We disagree.

 Due process is violated where a provision "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, ——, 128 S.Ct. 1830, 1845, 170 L.Ed.2d 650 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)). Mere "generality" does not render a provision unconstitutional because "broad terms" are often necessary to cover "varied circumstances." *Watso v. Colorado Dep't of Social Services*, 841 P.2d 299, 309 (Colo.1992).

 The "degree of vagueness tolerated by the Constitution depends on the nature of the enactment being challenged." *Board of Educ. v. Wilder*, 960 P.2d 695, 704 (Colo. 1998) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). A "stricter test applies" to provisions establishing criminal penalties or threatening to affect First Amendment rights. *Id.* But "a less stringent vagueness test is required," *id.*, and "greater tolerance" is allowed, *Hoffman Estates*, 455 U.S. at 498–99, 102 S.Ct. 1186, for provisions that do not affect speech and carry only civil penalties.

 Police departments have broad latitude to set and enforce internal standards governing their officers. The "government acting in the role of employer enjoys much more latitude in crafting reasonable work regulations for its employees": for example, it "'may ... prohibit its employees from being "'rude to customers,'"' a standard almost certainly too vague when applied to the public at large.'" *Greer v. Amesqua*, 212 F.3d 358, 369 (7th Cir.2000) (quoting *Waters v. Churchill*, 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)); *see also Piscottano v. Murphy*, 511 F.3d 247, 281 (2d Cir.2007) ("generalized language may appropriately be used to set out

standards of conduct for [government] employees"); *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir.1992) ("broad public employee dismissal standards have been upheld against void for vagueness attacks"). The Supreme Court has accorded special "deference" to rules a department "deems the most efficient in enabling its police to carry out the duties assigned to them under state and local law." *Kelley v. Johnson*, 425 U.S. 238, 246, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976).

*Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), upheld an extremely broad federal civil service standard. The Supreme Court rejected vagueness challenges to a statute allowing employees to be fired or suspended "for such cause as will promote the efficiency of the service." *Id.* at 158–62, 94 S.Ct. 1633 (plurality opinion of Rehnquist, J., joined by Burger, C.J., and Stewart, J.), 164–65, 94 S.Ct. 1633 (Powell, J., joined by Blackmun, J., concurring that statute was not unconstitutionally vague), 177, 94 S.Ct. 1633 (White, J., concurring that statute and regulations were not unconstitutionally vague).

Our supreme court has upheld a Denver Police Department rule allowing punishment for "conduct unbecoming an officer and a gentleman." *Hawkins v. Hunt*, 113 Colo. 468, 160 P.2d 357 (1945). *Hawkins* rejected the officer's contention that this standard was "so ambiguous and uncertain as to amount in practice to a nullity." *Id.* at 475, 160 P.2d at 360; *see also Cain v. Civil Service Commission*, 159 Colo. 360, 411 P.2d 778 (1966) (upholding discharge of Denver police officer for violating this rule). The large majority of other jurisdictions to consider the issue similarly reject constitutional vagueness challenges to police rules embodying this general standard. *See* Annotation, *Nonsexual Misconduct or Irregularity as Amounting to "Conduct Unbecoming an Officer," Justifying Police Officer's Demotion or Removal or Suspension from Duty*, 19 A.L.R.6th 217, §§ 3–4, at 244–50 (2006).

A provision requiring officers to use the "highest standard of efficiency and safety" likewise survives a vagueness challenge. This standard can be applied to evaluate the reasonableness of officers' actions in light of their training. *Cf. Cooper v. Civil Service Commission*, 43 Colo.App. 258, 261–62, 604 P.2d 1186, 1188–89 (1979) (rule that officers shall not "unnecessarily draw or display" firearms not vague as applied to trained police officers). As Justice Holmes explained in upholding a general reasonableness standard, "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." *Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); *see also* Note, *The Void–for–Vagueness Doctrine in the Supreme Court*, 109 U. Pa. L.Rev. 67, 93 (1960) ("Many legal responsibilities may be made to turn—as many common-law duties have traditionally turned—upon the 'reasonableness' of conduct as viewed by some trier of fact.").

Turney contends that "never before this case" had tactical errors preceding the use of deadly force "been the subject of discipline" rather than "matters for post-incident critique and further training." This does not establish vagueness. It would be a different matter, raising due process issues under the entrapment-by-estoppel doctrine, had the department affirmatively assured officers they would not be disciplined for poor tactical decisions in this context. *See United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 673–74, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973) (distinguishing vagueness claim from one that a party "was affirmatively misled by the responsible administrative agency into believing that the law did not apply in this situation"); *Raley v. Ohio*, 360 U.S. 423, 438, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959) ("Here there were more than commands simply vague or even contradictory. There was active misleading."). Turney, however, has not alleged or shown any such affirmative assurances that could rise to this level.

The "real safeguard under a general standard is the common-law adjudicatory process coupled with judicial review." *Wishart v. McDonald*, 500 F.2d 1110, 1117 (1st Cir. 1974), *quoted with approval in San Filippo*, 961 F.2d at 1137. The standard here is an objective one providing fair notice, and judi-

cial review is available to ensure it is applied fairly. *Cf. Watso,* 841 P.2d at 311 (rejecting vagueness challenge because the "good cause standard thus requires objective evaluation of different interests in varied factual contexts, and its application is subject to judicial review").

### B. The Non–Constitutional Challenges

#### 1. Commission Review Authority

■ Turney contends the commission exceeded its authority when it overturned the hearing officer's decision. Denver Municipal Code § 9.4.15(F) "limit[s]" commission review in non-dismissal disciplinary actions to one of four specified grounds. Contrary to Turney's contention, review was authorized by two of those grounds because the hearing officer's decision reasonably could be determined to have rested on "an erroneous interpretation of departmental or civil service rules" and "policy considerations that may have effect beyond the case at hand." § 9.4.15(F)(b) & (c); *see also* Denver Civil Service Comm'n Rule 12, § 6(C) & (E) (listing same grounds for appeal to and review by commission).

The commission likewise adhered to the requirements that "[a]ll factual findings by the Hearing Officer shall be binding on the Commission, and the Commission may not resolve disputed issues of fact." § 9.4.15(F). The commission accepted the hearing officer's factual findings and did not resolve any disputed issues of historical fact. While it disagreed with the hearing officer's ultimate conclusions as to whether Turney had constitutionally adequate notice and had acted in a manner reasonably expected of Denver police officers, these determinations involved mixed questions of law and fact on which the hearing officer did not have the final word. *Cf. Ornelas v. United States,* 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (lower court rulings whether police acted reasonably under the Fourth Amendment are subject to de novo review); *People v. Gonzales,* 987 P.2d 239, 242 (Colo.1999) (trial court's "application of a legal standard to historical fact is a matter for de novo appellate review").

#### 2. The Legal Standards Governing Turney's Actions

■ Turney contends his actions before the shooting must be reviewed under the use-of-force policy rather than under the section 3.13 "efficiency and safety" provision. We hold the department is not legally precluded from using section 3.13 to review the propriety of its officers' tactical decisions preceding an actual use of force.

Denver's public safety managers historically have interpreted the use-of-force policy to cover only the circumstances existing at the moment force was used. The policy refers to the "immediate situation" surrounding the force, and goes on to discuss Colorado criminal statutes and case law: it states, in part, that "Colorado law does not require an officer to retreat from an attack rather than resorting to physical force." Operations Manual § 105.00(3) (citing *Boykin v. People,* 22 Colo. 496, 45 P. 419 (1896)). Denver District Attorneys, investigating this and other police shootings, similarly have construed Colorado *criminal* self-defense laws to limit consideration to the "final frame" instant when shots were fired.

Turney contends the manager's construction is wrong because the policy also incorporates federal standards—applied in *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)—requiring that police use of force be reasonable. According to Turney, federal law, as construed in Tenth Circuit cases such as *Bella v. Chamberlain,* 24 F.3d 1251, 1256 n. 7 (10th Cir.1994), considers some preceding events in evaluating the reasonableness of force. This is debatable: federal appellate courts are "in conflict ... with respect to whether and to what extent pre-seizure conduct must be taken into account in assessing the reasonableness of police use of force." Michael Avery, *Unreasonable Seizures of Unreasonable People: Defining the Totality of Circumstances Relevant to Assessing the Police Use of Force Against Emotionally Disturbed Peo-*

*ple,* 34 Columbia Hum. Rts. L.Rev. 261, 282 (2003).

In any event, the question is not whether pre-shooting tactics potentially could violate the department's use-of-force policy, Colorado self-defense law, or federal law. We accept the manager's interpretation that pre-shooting tactics fall outside the use-of-force policy not because we are convinced it is incontrovertibly correct but because it is the interpretation relied on to discipline Turney.

The question is whether pre-shooting tactics potentially could violate a different department policy. We answer that affirmatively. Nothing in the use-of-force policy makes it the exclusive basis for evaluating officer tactics preceding a use of force. And police departments may—indeed, they should—impose higher internal standards on their officers than simply not violating state criminal law and avoiding federal damages liability.

### 3. Turney's Remaining Contentions

Turney contends the commission erred by construing the section 3.13 "highest standard" provision to require that he use "ideal" rather than simply "reasonable" tactics. We do not construe the opinion as requiring officers to do anything more than act reasonably and consistently with their training. The commission concluded Turney "failed to understand the totality of the situation, and therefore disregarded the opportunity to de-escalate the force after the situation had changed" with the removal of everyone but Paul from the home. This conclusion, if supported, would mean that Turney acted unreasonably.

▮ There was adequate support in the administrative record for an ultimate determination that Turney acted unreasonably. The manager, police chief, and an outside expert testified that Turney should have allowed the outer security door to close to create an additional barrier and provide additional time to evaluate an action plan once no lives were at risk. Turney provided contrary evidence that could have supported a determination that he acted reasonably under the fast-developing circumstances of the case.

But it is not a reviewing court's responsibility to make this determination. We uphold the commission's determination because it was not "devoid of evidentiary support," *Widder,* 85 P.3d at 526–27.

Turney challenges the commission's statement that better tactics *"would* have resulted in the use of less force to remedy the matter." (Emphasis added by Turney.) Turney contends that while a temporary retreat following evacuation of the other occupants *"may have* resulted in a peaceful resolution," there is no way of knowing this "would absolutely have been the case." We decline to overturn the commission's determination simply because its opinion used the word "would" rather than "could." The ruling did not depend on what "would" have happened had better tactics been used but rather on a determination that Turney's tactics were unreasonable under the circumstances.

Turney finally contends that the commission disregarded due process when it wrote that he "may not rely upon any due process theories to invalidate the discipline levied against him for violation" of section 3.13. This statement must be read in context: the commission explained the reason Turney could not do so was "because Operations Manual § 3.13 unambiguously requires police officers to perform their job duties with the highest standard of safety." While it might have been more felicitous to write that due process was not violated rather than that Turney may not rely on due process theories, the language challenged by Turney is not grounds for reversal. We have conducted de novo review of Turney's due process contentions and, as set forth above, have concluded that Section 3.13 was applied consistently with Turney's constitutional rights to due process.

### III. Conclusion

The judgment is affirmed.

Judge CASEBOLT concurs.

Judge ROY dissents.

Judge ROY dissenting.

Because I have concluded that Denver Police Department Operations Manual § 3.13 (Ops. 3.13) is void for vagueness and violates the officer's rights to substantive due process, I respectfully dissent.

The hearing officer found, with support in the record, that Denver police officers receive over three months of training at the academy and fourteen weeks of field observation. They are taught to use lethal force as a last resort; put themselves in a position to act rather than react; make the suspect come to them rather than go to the suspect; expect the unexpected when handling "in-progress" calls; and communicate, move, and shoot (tactical principles). Officers are not required to retreat from a confrontation. With respect to edged weapons such as knives, officers are taught that a suspect can cross twenty-one feet and stab an officer in less time than that officer can draw and fire his weapon. Here, the officer, by placing himself between the victim and the other occupants of the residence, was within twenty feet of the victim from the outset.

The evidence at the hearing included statements from each witness that it is impossible to teach an officer how to deal with any one specific situation. In addition, witnesses testified that the officer used good tactics in going to the door when he first arrived, but bad tactics in failing to disengage the victim after the hostages were safe; that the officer should have used either the door, by closing it, or bushes in the yard as a barrier between him and the victim; that he should have spoken with the family concerning the victim; that he should have used more caution; that he was required to intervene immediately due to the priority nature of the call; that it either was or was not a good tactical decision to order the victim to come out; that immediate action was required; that a suspect ultimately controls the result of a situation; that, given the victim's compliance with the officer's initial command to "come out," he demonstrated a compliant attitude and consequently not disengaging and ordering him to drop the knife were appropriate; that by disengaging and closing the security door, nothing less than deadly force could have been used had the victim come out with the weapon; that suspects present far greater danger outside due to a larger containment perimeter; that once visual contact is made with a suspect, an officer should not break that contact; and that no reasonable officer would have considered closing the door.

The Manager of Safety previously had concluded that at the time the officer used deadly force, that force was justified. The inquiry relates to the officer's acts, or failure to act, prior to that point in time. Those events occurred in the eight seconds that elapsed between the victim's mother telling the officer that the victim was behind the door with a knife and the fatal shots.

I recognize that in certain limited and special arenas, such as prison or military discipline, rights to procedural and substantive due process may be limited and courts are reluctant to intervene. *See Lawson v. Zavaras,* 966 P.2d 581, 585 (Colo.1998) (prisons); *People v. Sisson,* 179 P.3d 193, 196–97 (Colo.App.2007) (same); *Green v. Nadeau,* 70 P.3d 574, 576 (Colo.App.2003) (same); *United States ex rel. French v. Weeks,* 259 U.S. 326, 335, 42 S.Ct. 505, 66 L.Ed. 965 (1922) (military); *Dodson v. Zelez,* 917 F.2d 1250, 1261 (10th Cir.1990) (same).

However, police officers and fire fighters subject to disciplinary proceedings are entitled to all due process protections afforded by statutory and decisional law. *Cain v. Civil Serv. Comm'n,* 159 Colo. 360, 366, 411 P.2d 778, 781 (1966); *Bratton v. Dice,* 93 Colo. 593, 603, 27 P.2d 1028, 1031–32 (1933); *see also Frazzini v. Wolf,* 168 Colo. 454, 458, 452 P.2d 13, 15 (1969); *City of Miami v. F.O.P. Miami Lodge 20,* 571 So.2d 1309, 1329 (Fla.Dist.Ct.App.1989).

When a police officer is disciplined or terminated, the party imposing the sanction bears the burden of proof. *See Dep't of Inst. v. Kinchen,* 886 P.2d 700, 709 (Colo.1994) (citing *Heidebur v. Parker,* 505 S.W.2d 440, 443 (Mo.Ct.App.1974)). A determination imposing a penalty on a policeman must be justified, and it must appear the officer was guilty of some breach of duty. *Petersen v. Civil Serv. Bd.,* 67 Cal.App. 70, 227 P. 238, 240 (1924) (breach of duty must be clear

under charter provisions to subject officer to punishment).

Both the United States and Colorado Constitutions prohibit the state from depriving a person of life, liberty, or property without due process of law. *See People v. Bovard,* 87 P.3d 215, 216 (Colo.App.2003), *rev'd,* 99 P.3d 585 (Colo.2004). Procedural due process, on the one hand, requires fundamental fairness in procedure and is met if the party is provided with notice and an opportunity to be heard. *Avalanche Indus., Inc. v. Indus. Claim Appeals Office,* 166 P.3d 147, 150 (Colo.App.2007), *aff'd sub nom. Avalanche Indus., Inc. v. Clark,* 198 P.3d 589 (Colo. 2008). Substantive due process, on the other hand, guarantees that the state will not deprive a person of those rights for arbitrary reasons regardless of how fair the procedure is. *Brammer–Hoelter v. Twin Peaks Charter Acad.,* 81 F.Supp.2d 1090, 1100 (D.Colo. 2000).

Substantive due process requires the regulation or government action be reasonable, as distinguished from arbitrary or capricious. *Salazar v. Am. Sterilizer Co.,* 5 P.3d 357 (Colo.App.2000). If the right being abridged is fundamental, courts apply the strict scrutiny test to the regulation; if the right is not fundamental, the regulation need only bear a rational relationship to a legitimate state objective to survive constitutional muster. *Lorenz v. State,* 928 P.2d 1274, 1277 (Colo.1996).

A law is void for vagueness, in violation of due process, if its prohibitions are not clearly defined. *Coalition for Equal Rights, Inc. v. Owens,* 458 F.Supp.2d 1251, 1262 (D.Colo. 2006), *aff'd,* 517 F.3d 1195 (10th Cir.2008). The void for vagueness doctrine is rooted in the right to due process of law, which requires a law to provide fair notice of the conduct that it proclaims unlawful; a law offends due process if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement. *People v. Shell,* 148 P.3d 162, 172 (Colo.2006). A government regulation may not sweep unnecessarily broadly and must provide sufficient standards to guide administrative bodies in exercise of their functions to comport with due process. *Assembly of Yahveh Beth Israel v. United States,* 592 F.Supp. 1257, 1262 (D.Colo.1984). When a rule requires or prohibits an act in terms so vague that persons of common intelligence necessarily must guess at its meaning and differ as to its application, the regulation violates due process. *Loonan v. Woodley,* 882 P.2d 1380, 1389 (Colo.1994).

Notice of what is prohibited or required applies to administrative regulations. *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *United States v. Akeson,* 290 F.Supp. 212, 216 (D.Colo.1968); *People v. Lamb,* 732 P.2d 1216, 1218–19 (Colo.1987); *Barham v. Univ. of N. Colo.,* 964 P.2d 545, 548 (Colo.App. 1997). An agency rule need not define statutory terms with linguistic precision in order to withstand a vagueness challenge, nor does a rule or statute have to specify every conceivable boundary of its application. *Brighton Pharmacy, Inc. v. Colo. State Pharmacy Bd.,* 160 P.3d 412, 420 (Colo.App.2007). However, construction and application of administrative regulations must provide fair warning to persons to whom they are applicable. *Akeson,* 290 F.Supp. at 216. The "guiding principle" in a void for vagueness challenge is whether the terms of the regulation are sufficiently specific to apprise persons of ordinary intelligence, here trained police officers, of the particular conduct that will subject them to liability or whether the standards are so poorly defined as to create a danger of arbitrary and capricious enforcement. *Electron Corp. v. Wuerz,* 820 P.2d 356, 358 (Colo.App.1991).

Rules adopted by an administrative or regulatory agency are presumed valid, and the challenging party must establish the rule's invalidity beyond a reasonable doubt. *Barham,* 964 P.2d at 548; *Electron Corp.,* 820 P.2d at 357. Although courts extend deference to an agency's interpretation of its own rules, they are not bound by it, particularly where the agency's interpretation is not uniform or consistent. *See Williams v. Kunau,* 147 P.3d 33, 36 (Colo.2006); *Lobato v. Indus. Claim Appeals Office,* 105 P.3d 220, 223 (Colo.2005).

While it is true that a vague regulation can be salvaged through prior, narrowing interpretation, *Parker v. Levy,* 417 U.S. 733, 734,

751, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), a vague regulation cannot be saved through prospective "proper application" because such a rule contains no objective criteria for determining precisely what constitutes proper application. *Bence v. Breier*, 501 F.2d 1185, 1189 (7th Cir.1974). Thus, such a regulation is vague, not in the sense that it requires a person to conform conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all, and people of common intelligence necessarily must guess at its meaning. *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

Conduct that exemplifies the highest standards of efficiency or safety for one person may not for another. *See id.* In several cases from other jurisdictions, regulations requiring the "highest standards of efficiency," without more, have been held unconstitutionally vague. *See, e.g., Connors v. Crabb*, 176 A.D.2d 1053, 575 N.Y.S.2d 199, 200 (1991) ("phrase 'highest standards of efficiency' forced individuals of common intelligence to guess at its meaning" and thus was unconstitutionally vague); *Slawinski v. Milwaukee City Fire & Police Comm'n*, 212 Wis.2d 777, 569 N.W.2d 740, 742–43 (App.1997) (trial court's sua sponte ruling that "highest standards of efficiency" standard was unconstitutional as overly subjective and vague required supplemental briefing; however, the court of appeals noted the ruling very well could be correct but the parties needed an opportunity to address the constitutionality issue; the trial court specifically found that "highest standards of efficiency" had no objective definition, no standard requisite level of disruption existed to merit discipline, and the phrase was subject to subjective application).

In cases upholding the phrase "highest standards of efficiency" against a challenge that it is unconstitutionally vague, additional provisions directed or limited its application and enforcement to specific conduct. *See, e.g., Cox v. Sheriff's Merit Comm'n*, 283 Ill. App.3d 742, 218 Ill.Dec. 739, 669 N.E.2d 1265, 1267 (1996) ("highest standards of efficiency" imbedded in definition of "unsatisfactory performance," which was "demonstrated by a lack of knowledge of the application of laws required to be enforced; an unwillingness or inability to perform assigned tasks; the failure to conform to work standards established for the officer's rank, grade, or position"); *Department of Pub. Safety & Corr. Servs. v. Howard*, 339 Md. 357, 663 A.2d 74, 76 (1995) (rule required duties to be performed at "highest standards of efficiency"; unsatisfactory performance defined by "lack of knowledge, unwillingness or inability to perform assigned tasks, failure to conform to work standards established for the member's rank, grade, or position, or failure to take appropriate action to ensure compliance with Agency regulations"); *Pennsylvania State Troopers Ass'n v. Pa. State Police*, 667 A.2d 38, 39 (Pa.Commw.Ct.1995) ("highest standards of efficiency" included in sub-definition of "competency"); *State ex rel. Hennekens v. City of River Falls Police & Fire Comm'n*, 124 Wis.2d 413, 369 N.W.2d 670, 674–75 (1985) ("highest standards of efficiency" not unconstitutionally vague where it was part of department rule forbidding officers from engaging in unbecoming conduct and contained further definition forbidding associations with persons under criminal investigation).

Likewise, rules compelling the "highest standard of safety" require additional particulars to direct application or enforcement. *See, e.g., Earle v. Netjets Aviation, Inc.*, 2006 WL 1878920, *3 (S.D.Ohio 2006) (pilots subject to discharge for violating business practice of "highest standards of safety," which specifically occurs when consuming alcohol within twelve hours of flight departure time), *aff'd*, 262 Fed.Appx. 698, 2008 WL 282740 (6th Cir.2008); *Johnson v. Nat'l Transp. Safety Bd.*, 979 F.2d 618, 622 (7th Cir.1992) ("highest standards of safety" violated when pilot turned over flight controls to co-pilot with blood alcohol level of 0.14).

Recognizing that analogies are fraught with peril, I nevertheless posit one. We have had two relatively recent and serious commercial aircraft incidents following which the captains were immediately, universally, and deservedly considered heroes. The first was the controlled crash at Sioux City, Iowa, with

some fatalities, after the loss of one engine and all of the hydraulics operating the tail-control surfaces. The second was a "ditching" in the Hudson River following a loss of power shortly after takeoff from LaGuardia Airport in New York City. Someone with all of the relevant data and a complex computer model might conclude that the optimum use of power in the first would have permitted a controlled landing, or that the use of optimum flying techniques in the second would have permitted arrival at Teterboro Airport in New Jersey, a destination considered but rejected by the captain, with altitude and airspeed to spare. Assuming for the purposes of my analogy only that the computer is correct in both instances, did these trained professionals fail to live up to "highest standards of efficiency and safety" and, if so, what in that language can be used to reach that conclusion?

The commission offers four cases in support of its contention that Ops. 3.13 is constitutional: (1) *Stamm v. City & County of Denver,* 856 P.2d 54 (Colo.App.1993); (2) *Barham,* 964 P.2d 545; (3) *Benke v. Neenan,* 658 P.2d 860 (Colo.1983); and (4) *Cooper v. Civil Service Commission,* 43 Colo.App. 258, 604 P.2d 1186 (1979).

(1) At issue in *Stamm* was an executive order prohibiting employees from "being under the influence or impaired by alcohol" at work. 856 P.2d at 55. A division of this court held that the executive order's wording was sufficiently precise and capable of defined meaning that persons of ordinary intelligence need not guess at its meaning and that it reasonably forewarned those people. *Id.* at 56–57. The division also noted there was no danger of arbitrary or capricious enforcement. *Id.* at 57.

(2) In *Barham,* a tenured professor alleged that a code providing for termination of tenured faculty only for a "legally sufficient ground or reason" was unconstitutionally vague. 964 P.2d at 548. A division of this court held that the phrase supplied fair warning to the professor. *Id.* Even if it had not, the division found that upon several occasions, the professor had been informed of the policy, explicitly warned that his specific conduct was unacceptable under that stan-

dard, and thus received ample prior notice. *Id.* at 548–49.

(3) At issue in *Benke* was a statute providing the grounds for dismissal of a tenured teacher for "incompetency, neglect of duty, immorality, conviction of a felony, insubordination, or other good and just cause." 658 P.2d at 861. Our supreme court held the terms "incompetency" and "neglect of duty" were sufficiently precise such that persons of common intelligence need not guess at their meaning. *Id.*

(4) Finally, in *Cooper,* a Denver police officer contended that a police department regulation stating "[o]fficers shall not unnecessarily draw or display any firearms" was unconstitutionally vague. 43 Colo.App. at 261, 604 P.2d at 1188. A division of this court held that common knowledge of what was *prohibited* could be gleaned from the training officers received and that the regulation was sufficiently clear and understandable to the group to be valid and enforceable. *Id.* at 261–62, 604 P.2d at 1188–89.

However, at issue in each of these cases were regulations that contained language sufficiently precise to forewarn persons of ordinary intelligence what was prohibited conduct. The wording was definite enough to prevent arbitrary and capricious enforcement.

Such is not the case here. In my view, Ops. 3.13 is unconstitutionally vague and cannot be enforced in a disciplinary proceeding. It does not give an officer prior warning that his or her conduct could fall, or has fallen, below the "highest standards of efficiency and safety." Nor could it reasonably forewarn persons of ordinary intelligence as to its meaning and application. The question here is whether the officer's conduct fell below the acceptable standards of police procedure based on Ops. 3.13's vague "highest standards of efficiency and safety requirements," including whether any prior notice and application of Ops. 3.13 existed or whether his conduct fell below the level of professionalism expected of him from his training. I cannot conclude it did. At best, Ops. 3.13 is an aspirational goal for, or a subjective standard of, a limitless array of conduct.

There is nothing in Ops. 3.13, nor in its context, which defines or limits its application. Nor is there anything in the history of its enforcement which would provide notice to an officer that it could be used to impose discipline for a tactical misjudgment. Without additional particulars or history guiding its application, I cannot conclude it would forewarn a person, or in this case an officer, of common intelligence what conduct it prohibits or requires.

The hearing officer found that Ops. 3.13 had never been used to discipline officers in deadly force situations in the past, including three deadly force incidents—one as proximate to this incident as 2003—where officers shot suspects with bladed weapons but failed to use the best tactics; that deadly force situations were disciplined separately and used as training tools for the future; and that Ops. 3.13 had only been used as a disciplinary basis in two prior instances, both of which demonstrated an egregious breach of professional police conduct in non-deadly force encounters. These facts, as found by the hearing officer, are entitled to deference. *Colorado–Ute Elec. Ass'n v. Pub. Utils. Comm'n*, 760 P.2d 627, 640 (Colo.1988).

The phrase "highest standards of safety and efficiency" is not independently capable of specific, objective meaning because it defines no standard level of conduct to merit discipline. We note also that, since the officer's discipline in this incident, Ops. 3.13 has been revised to include more particularized, objective language with additional criteria directing its application. As a standard of performance, the blanket regulation requiring the "highest standards of safety and efficiency" alone simply is too vague for meaningful application or notice as to what it prohibits.

Therefore, I would reverse the judgment and vacate the officer's ten-month suspension.